PETER J. WEBBE AND PATRICIA WEBBE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Webbe v. Commissioner
Docket No. 42331-85.
United States Tax Court
T.C. Memo 1987-426; 1987 Tax Ct. Memo LEXIS 423; 54 T.C.M. (CCH) 281; T.C.M. (RIA) 87426; August 26, 1987. James F. Nangle, Jr., for the petitioners. Robert J. Burbank, for the respondent. KORNER
MEMORANDUM FINDINGS OF FACT AND OPINION KORNER, Judge: Respondent determined a deficiency in and additions to petitioners' Federal income tax for the tax year ended December 31, 1981, as follows: Additions to Tax
Deficiency
Sec. 6653(a)(1) [1]
Sec. 6653(a)(2)
$ 240,919
$ 12,045
*
*426 After concessions, the issues remaining for decision are: (1) Whether petitioner [2] is entitled to a $ 209,501 deduction for legal fees allegedly paid in 1981; (2) whether petitioner is entitled to a $ 113,700 deduction for office operations and salary expenses allegedly paid in 1981; (3) whether petitioner is entitled to miscellaneous business deductions of $ 2,844 for expenses incurred in 1981; (4) whether petitioner may increase the basis in his Aladdin Hotel Corporation stock by the amount of legal fees paid for services rendered in negotiating and closing the 1981 sale of the stock; (5) whether petitioner is allowed in 1981 an offset to the gain from the sale of his Aladdin Hotel Corporation stock by the amount of his basis in the stock as a result of alleged contingencies in 1981; (6) whether petitioner is entitled to a deduction of $ 238,587 for interest expenses incurred in 1981; (7) whether petitioner is entitled to a $ 37,338 investment tax credit composed of rehabilitation expenditures and of expenditures for new and used furniture placed in service in the Gateway Hotel in 1981; and (8) whether petitioner is liable for additions to tax pursuant to section 6653(a)(1) and *427 section 6653(a)(2) for the 1981 taxable year. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. General Background
Petitioners, Peter J. Webbe (hereinafter "petitioner") and Patricia Webbe, husband and wife, resided in St. Louis, Missouri, at the time they filed their petition herein. Petitioners filed a joint Federal individual income tax return using the cash method of accounting for the taxable year ended December 31, 1981. [3]
In the late fall of 1971, petitioner acquired a 15 percent interest in the Aladdin Hotel Corporation (hereinafter the "Aladdin") for approximately $ 150,000. At that time, the Aladdin owned and operated the Aladdin Hotel and Casino (hereinafter the "Aladdin Hotel") *428 in Las Vegas, Nevada. The Aladdin Hotel had approximately 310 rooms at the time petitioner acquired his interest. During the 1970's the hotel was expanded to more than 1,200 rooms. By 1975, petitioner's ownership interest in the Aladdin has increased to 45.11278 percent. In September of 1980, the stockholders of the Aladdin and their respective stock ownership percentages were as follows: Ownership
Percent
Peter Webbe
45.11278
Richard L. Daly
15.03760
Sam Diamond
6.01504
Moe E. George
30.07518
John J. Jenkins
3.00752
George Morse
0.75188
Sorkis J. Webbe, Sr. ("Sorkis"), petitioner's brother, was the general counsel of the Aladdin and was instrumental in petitioner's investing in the Aladdin. Sorkis died on May 29, 1985. Legal Fees -- The Linton Case
The Aladdin began to experience considerable legal problems during 1976. A Grand Jury investigation of the Aladdin began in that year and continued through 1979. On September 4, 1979, an indictment was handed down naming the following defendants: the Aladdin, Lee Linton, Sorkis J. Webbe, Fred L. Kennedy, Robert C. Tindell, Dennis Piotrowski, Del E. Webb Corporation, and James R. Comer. *429 [4] The indictment contained 43 counts. Count 1 was a conspiracy count pursuant to, inter alia, 18 U.S.C. sec. 371 (1982). Counts 2 through 13 were charges of using the United States mails in furtherance of a scheme to defraud, in violation of 18 U.S.C. secs. 1341 and 1342 (1982). Counts 14 through 28 were charges of using interstate wire facilities in furtherance of a scheme to defraud in violation of 18 U.S.C. secs. 1342 and 1343 (1982). Counts 29 through 37 were charges of transporting in interstate commerce money or property taken by fraud in violation of 18 U.S.C. secs 2312 and 2314 (1982). Counts 38 and 39 were charges of interfering with commerce or the movement of articles and goods in commerce by extortion in violation of 18 U.S.C. sec. 1951 (1982). Count 40 was a substantive count of violating the Racketeer Influenced and Corrupt Organization ("RICO") Statute, 18 U.S.C. secs. 1961-1968 (1982). Counts 41-43 were charges of income tax evasion against Lee Linton. The Aladdin was not only named as a defendant in the Linton case, but *430 it was also designated as the "enterprise" -- one of the essential elements in a RICO case. The trial of the Linton case began in May of 1981 and continued through the late fall of 1981. The causes of action involved in the Linton case arose prior to the sale of the Aladdin and while petitioner was an executive officer and employee of the Aladdin. On November 30, 1981, a jury verdict of not guilty was returned as to count 1 in the Linton case. Immediately thereafter, all of the other counts with the exception of the three counts of income tax evasion against Lee Linton, were dropped. During 1981, a checking account entitled "Sorkis J. Webbe, agent for stockholders," (hereinafter the "Agent Account") was maintained at the Missouri State Bank and Trust Company. The Agent Account was set up for the purpose of paying the attorneys involved in the Linton case. Checks drawn on the Agent Account during the year 1981 were paid to various attorneys, law firms, *431 and others as set out below: Payee
Amount Received
Albert J. Krieger
$ 145,000.00
James M. Shellow
[5] 103,585.95
Charles A. McNelis
27,500.00
James A. Twitty
75,000.00
Burke & Smith
6,503.70
Others
5,946.18
Don Carpenter
9,025.00
Jay Schulman
4,002.00
Court Reporters
6,453.24
Total
$ 383,106.07
Charles A. McNelis represented the Aladdin in the *432 Linton litigation. Albert Krieger represented Sorkis in the Linton case. James Shellow represented the Aladdin in an interlocutory appeal taken in the Linton case. James A. Twitty represented Dennis Piotrowski in the Linton case. [6]
Sharlo Leonard maintained the office records of the Agent Account from which the attorneys in the Linton case were paid. During 1981, Ms. Leonard was responsible for coordinating attorney work schedules, paying bills, making deposits, typing, filing, and for the temporary group law office that was located in Las Vegas, Nevada. The house had four bedrooms, files, a copy machine, a computer, secretarial equipment, offices, and a kitchen. The total amount of deposits made to the Agent Account during 1981 that were available to be used to pay the legal fees in the Linton case was $ 530,950. The total amount of checks actually written on and clearing the Agent Account for the year 1981 (other than checks which merely constituted a wash or loan) was $ 543,466.91. Valley Bank of Nevada Account *433 Number 170038394 (the "Office Account") was used to pay costs involved in the Linton case, including investigators, court reporters, a copying machine, a telephone, housekeeping, utilities, rent, groceries, dry cleaning, catering meals, hotel rooms for attorneys, airline tickets, polling for jury selection, and Sharlo Leonard's salary. The Office Account was funded by the Agent Account. The total amount transferred from the Agent Account to the Office Account during 1981 was $ 113,700. [7]
One of the sources of funds for both the Agent Account and the Office Account was a $ 1.6 million joint loan [8] in the names of petitioner and Richard Daly. During 1981, $ 328,000 of the proceeds of the loan were transferred into the Agent Account. [9]
*434 The Sale of the Aladdin
On August 20, 1980, petitioner and the other shareholders of the Aladdin entered into an agreement to sell their Aladdin stock to N&T Associates, Inc., ("N&T") a Nevada corporation owned by Carson Wayne Newton and a trust for the benefit of the children of Edward Ray Torres. The sales transaction was closed on September 30, 1980. Petitioner's total share of the sales proceeds was $ 20,241,164, consisting of a downpayment at the closing in the amount of $ 1,293,797 and a receivable in the amount of $ 18,947,637. Petitioner elected to report the gain from the same using the installment method pursuant to section 453. A separate promissory note with regard to each of the deferred principal payments due was received by petitioner. The promissory notes were each secured by a pledge of all of the stock of the Aladdin. The Valley Bank of Nevada retained possession of the promissory notes and acted as collecting agent for the parties to the sales transaction. The $ 1.6 million loan, discussed above, was secured by certain of the promissory notes. The promissory notes held as security for the loan had a total value of $ 2,003,776.72. Section 10.13 of *435 the sales agreement provides that: Buyer acknowledges that Aladdin is, and after the date of Closing will continue to be, a party to the litigations listed on Exhibit 10.13 hereto and that the Stockholders have a right to assume the defense thereof under the indemnity provisions hereof. The Stockholders intend to assume the defense of such litigations as permitted hereby. Buyer agrees that, if the transaction contemplated hereby is consummated, (i) it and/or Aladdin shall reimburse, on demand, the Stockholders for all reasonable fees, costs and expenses (including, without limitation, reasonable fees and disbursements of counsel chosen by the Stockholders) incurred by the Stockholders (x) prior to the date of Closing, relating to the defense or prosecution of such litigations and (ii) that the amount of such fees, costs and expenses shall not be covered by the indemnification provisions hereof and shall, under no circumstances, be the basis of a claim for indemnification from the Stockholders pursuant to the indemnification provisions hereof. Exhibit 10.13 provides in pertinent part: (1) United States of America, Plaintiff vs. Lee Linton, Sorkis J. Webbe, Fred L. Kennedy, Robert *436 C. Tindell, Aladdin Hotel Corporation, Dennis Piotrowski, Del E. Webb Corporation, James R. Comer, Defendants. Case No. Cr LV 79-83 United States District Court, District of Nevada
After the sale, petitioner became aware that Mr. Newton and Mr. Torres were having serious disagreements as to the management of the Aladdin. Mr. Newton ultimately relinquished his interest in the Aladdin on June 30, 1982, when he sold it to Mr. Torres. Petitioner believed that if Mr. Newton got out of the Aladdin deal he and the other shareholders would not get paid by Mr. Torres. The basis for his concern was that Mr. Torres had invested $ 25 million in the El Rancho Hotel in Las Vegas shortly after he had bought his interest in the Aladdin and, as a result, was having financial difficulties. In accordance with petitioner's payment schedule reflecting the sale of his interest in the Aladdin, he was to receive 168 payments beginning in July of 1981 and ending in September of 1994. The down payment was received and the four payments due in 1981, totaling $ 1,443,608, were also timely received. Seven of the twelve payments due in 1982, in an aggregate amount of $ 1,263,157 were also made. The *437 payment due June 1, 1982, however, was not made until July 22, 1982. The next installment payment, due July 1, 1982, was not made until September 9, 1982. Thereafter, no further payments were made or received. The deed of trust securing the purchase price on the sale of the Aladdin to N&T, was third in priority after two other deeds of trust in amounts totaling approximately $ 41 million. N&T filed for relief under Chapter 11 of the Bankruptcy Act on February 8, 1984. The Internal Revenue Service has filed a claim against N&T for approximately $ 19,958,059.99 in the bankruptcy proceeding. The claim contains assessed corporate taxes plus interest for the periods ending May 31, 1973, 1974, 1975, 1977, 1978, 1979, and 1980, totaling approximately $ 17,094,677. Aladdin Sale - Legal Fees
Sorkis and David Hurwitz conducted all of the negotiating for the sale of the Aladdin. Negotiations for the sale of the Aladdin were conducted with various prospective purchasers and at least six sales agreements were actually drafted. Mr. Hurwitz was paid his attorney's fees for his work in negotiating the sale of the Aladdin to N&T at the time of the closing of the sale. Petitioner *438 transferred $ 652,670 from one of his accounts with the Valley Bank of Nevada (Account No. 014072160) by debit memorandum on July 10, 1981, to the Valley Bank of Nevada in order to extinguish a loan of Sorkis's, also from the Valley Bank of Nevada. Of the total amount transferred, $ 300,000 was in satisfaction of the legal fees owed to Sorkis for his work in connection with the sale of the Aladdin. The source of the $ 652,670 was the previously discussed $ 1.6 million loan obtained by petitioner and Richard Daly during 1981. A Statement for Recipients of Miscellaneous Income (Form 1099) for 1981 was provided by petitioner to Sorkis reflecting the $ 300,000 paid for professional services, and Sorkis reported the $ 300,000 as income on Schedule C of Form 1040 of his Federal income tax return for the year 1981. The Investment Tax Credit
Petitioner and Victor Sayyah formed the Say-Web Partnership ("Say-Web") as equal partners on January 1, 1981. On that same date Say-Web purchased the Gateway Hotel, located in St. Louis, Missouri, for $ 3,200,000. The Gateway is an older hotel that was built in 1918 and in January of 1981, approximately 222 rooms were in service. Jay Churder *439 is the chief engineer of the Gateway Hotel. His responsibilities during 1981 included the supervision of 60 to 80 employees who worked on the general maintenance of the Gateway building and the general renovation of the building. The condition of the Gateway in January of 1981 was poor. As a result, a plan was undertaken to renovate the hotel. The first order of business in the renovation process was to clean all the trash out of the rooms and to remove the transient people staying at the hotel. After the initial cleanup, renovation of all the public areas including the lobbies, the meeting rooms, the bathrooms, the offices, and the rental offices was begun. At the same time the initial cleanup was done, work was begun in the lower basement of the building to tear out the old machinery and the old "brine" system and to replace all the concrete floors. In all, 52 tons of steel were cut out of the lower basement of the hotel. Work on the upper basement was begun in March of 1981 and not completely finished until November of 1982. Included in this process was the creation of a restaurant known as the Garden Room. This involved tearing down walls; building new walls; putting in *440 new bathrooms; installing a new 400 ampere electrical system, plumbing, tongue and groove walls, a cafeteria line, and a new tile floor. Work on the upper basement also included renovation of the kitchen which was begun in March of 1981 and finished in November of 1981. In the kitchen, all the old refrigeration was torn out and new units were installed, the old quarry floors were repaired, steam lines were installed, masonry walls were built, new equipment was installed, and a new 600 ampere electrical panel was installed. Work on the lobby of the Gateway Hotel was begun in March of 1981, and was finished in September of 1981, including the removal of all airline offices and overhangs, the repair of the marble floors and the laying of new floor marble, the setting of new doors for the Summit Room and the Terrace Room, rebuilding of the bathrooms on the first floor and building a new stairwell. Work on the Terrace Room was begun in April of 1981 and finished in December of 1981. This entailed relocating wiring and installing new conduit with the electrical fixtures. In addition, the marble floor was removed and walls were rebuilt with masonry. A new sound system was installed, *441 new duct work for the air conditioning and heating was installed, the entire room was replastered, all the marble was resurfaced, new masonry partitions were installed, and new doorways were installed. Work on the Summit Room located in the lobby area was begun in early 1981 and was finished in mid-1982. The same type of work as was done in the Terrace Room was done in the Summit Room. Work involving the front desk area was begun in February of 1981 and finished in mid-1982. Total renovation of this area was required including the installation of walnut walls and the renovation of all of the offices. The mezzanine floor was remodeled beginning in March 1981 and was finished in September of 1981. On the mezzanine level, floors were resurfaced, new wiring was installed, walls were plastered, the Daniel Boone Room was renovated, the executive offices were redone, heating and air conditioning were installed, the "guild office" was restored and the mezzanine hall offices were renovated. Work on the first floor was begun in May of 1981 and was finished in November of 1981. This work included knocking out any existing walls and rebuilding new walls in order to make larger, more comfortable, *442 rooms. In addition, work on the first floor included the plastering of new walls, the wiring of each room for electricity, and the installation of new plumbing, and carpeting. In all, 16 rooms were completed on the first floor. Work on the second floor was begun in May of 1981 and was finished in March or April of 1982. The same type of work done on the first floor was done on the second floor with 16 rooms also being completed. Renovation of the 15th floor was begun in May of 1981 and was finished in November of 1981. The type of work that was done on the first floor was also done on the 15th floor and in all, 28 rooms were completed. During 1982, the same type of work as was done on the first, second and fifteenth floors was done on the tenth floor, ninth floor, eleventh floor, and the twelfth floor. Approximately 130 rooms on these floors were completed in 1982. Petitioners paid $ 287,274.80 for the above building improvements during 1981. At the time the Gateway was purchased, furniture, fixtures, and equipment were already in use in the hotel. Many of these items were in good to excellent condition. Of the $ 3.2 million purchase price of the Gateway by Say-Web in 1981, *443 $ 337,034.25 was appraised and allocated to used furniture, fixtures, and equipment. The amount paid for the new furniture and fixtures that were installed in the Gateway Hotel during 1981 was $ 333,140.44. Interest Expense
During 1981, petitioner paid interest to the Missouri State Bank and Trust Company of St. Louis, Missouri, in the amount of $ 38,524.68 as a result of four separate loans. On the $ 1.6 million loan that was obtained by petitioner and Richard Daly from the Valley Bank of Nevada $ 122,856.51 of interest was paid during 1981. During the same year petitioner made several loans to a company called "Contracting Systems" in an aggregate amount of $ 217,000. At the time of the closing of petitioner's sale of his interest in the Aladdin, petitioner borrowed $ 900,000 (Loan No. 195372586) from the Valley Bank of Nevada and during 1981 paid interest on the loan totaling $ 121,396.41. Petitioner used the $ 900,000 proceeds from the loan to pay off four separate notes. Reporting Position
Schedule C of petitioner's joint Federal income tax return (Form 1040) for the 1981 tax year reflects income and deductions from petitioner's business activity as an "investor, *444 " as set forth below: Income
-O-
Less:
Interest on indebtedness
($ 238,587)
Legal and professional fees
(209,501)
Travel and entertainment
(1,606)
Copies of court transcripts
(1,238)
Loss
($ 450,932)
An investment tax credit totaling $ 37,338, consisting of: (1) a rehabilitation credit from building improvements; (2) an investment tax credit for new furniture; and (3) an investment tax credit for used furniture was also claimed on the 1981 return. An amended return was filed by petitioners on December 7, 1982, reflecting an additional deduction for a legal fee paid to Sorkis for services rendered in the negotiation and sale of petitioner's Aladdin stock in the amount of $ 300,000. By notice dated October 10, 1985, the above deductions and credits were disallowed by respondent. By amended petition filed October 27, 1986, petitioner claimed that the $ 300,000 legal fee paid to Sorkis should be added to the basis of his Aladdin stock and that the gain on the sale of the Aladdin should be reduced as a result of the alleged uncollectability of the promissory notes. OPINION Issue 1. The Linton Legal Fees
The first issue *445 for decision is whether petitioner is entitled to a $ 209,501 deduction for the legal fees incurred in the Linton case. Petitioner argues that he remained liable for the Linton legal fees even after the sale of the Aladdin, that he was compelled to pay the fees to avoid the potential seizure of the Aladdin, that the amount of fees paid was properly substantiated, and that they were deductible under section 162. Respondent asserts that petitioner was under no obligation to pay the Linton legal fees, that the amount thereof has not been properly substantiated, and that in any event, the fees were not properly deductible but instead should have been added to the basis of petitioner's Aladdin stock. Section 162(a) allows a deduction for "all ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business." One of the requirements of this section is that the taxpayer be obligated to make such a payment without the expectation of being reimbursed. See, e.g., Wolfers v. Commissioner,69 T.C. 975, 983-985 (1978). Petitioner's failure to satisfy this requirement permits respondent to prevail on this issue. The *446 evidence presented at trial as to whether petitioner alone was obligated to pay the Linton legal fees consists of petitioner's own testimony as well as the sales agreement between the Aladdin and N&T. At trial, petitioner testified that a resolution was passed by the Aladdin's board of directors whereby all of the Aladdin's shareholders were to be liable for the legal fees incurred in the Linton litigation. [10] We find this self-serving testimony to be vague and unpersuasive, and thus, entitled to little weight. No corroborating documentary evidence was produced, nor were any other witnesses -- such as directors or other shareholders -- called upon to corroborate this claim. More importantly, without more detailed evidence as to the terms of the alleged resolution, it is unclear what impact, if any, it had on the terms of the sales agreement. *447 As is set out in more detail in our findings, section 10.13 of the sales agreement specifically provides that upon completion of the sale, N&T and/or the Aladdin "shall reimburse, on demand, the Stockholders for all reasonable fees, costs and expenses * * * relating to the defense or prosecution of [the Linton litigation] * * *." The agreement thus makes it clear that although petitioner may have paid part of the Linton legal fees, the advances were made with the understanding that N&T or the Aladdin, or both, were obligated to reimburse him for these payments. Under these circumstances, petitioner was therefore making nondeductible loans to N&T and/or the Aladdin. Southern Pacific Transportation Co. v. Commissioner,75 T.C. 497, 566 (1980); Glendinning, McLeish & Co. v. Commissioner,24 B.T.A. 518, 523 (1931), affd. 61 F.2d 950 (2d Cir. 1932). [11]
*448 For these reasons, it is clear that the obligation to pay these fees was, in reality, not petitioner's and thus, he is not entitled to a deduction for their payment under section 162. [12]
*449 Issues 2 and 3. The Other Expenses of the Linton Litigation
The second [13] and third issues, concerning whether petitioner is entitled to a $ 113,700 deduction for payments for office operations and salaries made in connection with the Linton litigation, and whether miscellaneous Linton expenses of $ 2,844 are deductible, [14] must both be resolved in the same manner as the first issue. As detailed in our findings, section 10.13 of the sales agreement provides that the stockholders shall be reimbursed for "all reasonable fees, costs and expenses (including without limitation, reasonable fees and disbursements of counsel chosen by the Stockholders incurred by the Stockholders [in the Linton litigation]." This language clearly covers the office operation and other payments at issue, and hence, for the reasons discussed in connection with the first issue, petitioner is not entitled to a deduction for these amounts. *450 Issue 4. The Aladdin Sale Legal Fees
The fourth issue for decision is whether petitioner may increase the basis in his Aladdin stock by the amount of legal fees paid for services rendered in negotiating and closing the 1981 sale of the stock. Petitioner contends that he has adequately substantiated that he paid $ 300,000 of legal fees to Sorkis for the services Sorkis rendered in connection with the sale of the Aladdin, and that as such, this fee should be capitalized and added to the basis of his stock. Respondent asserts that the amount of fees has not been sufficiently substantiated and that not all the fees relate to the Aladdin sale, but concedes that if the amount of fees is established, then that figure should be added to the basis of petitioner's Aladdin stock. The burden of proving that the legal expenses were paid rests with petitioners. New Colonial Ice Co. v. Helvering,292 U.S. 435, 440 (1934); Welch v. Helvering,290 U.S. 111, 115 (1933); Rule 142(a). In this case we are convinced that petitioner did in fact pay $ 300,000 of legal fees to Sorkis in 1981. The uncontradicted evidence [15] supporting this proposition consists *451 of Sharlo Leonard's testimony, petitioner's testimony, a working paper prepared by Sharlo Leonard, a Form 1099 provided by petitioner to Sorkis, and Sorkis's 1981 income tax return.
At trial, Ms. Leonard, the legal secretary for the Aladdin -- whom we found to be a competent and credible witness -- testified that Sorkis was involved with the sales negotiations for the Aladdin, and that a result of his efforts was the production of at least six proposed sale agreements. Petitioner corroborated this testimony and specifically indicated that the amount of fees paid was $ 300,000. The working paper prepared by Ms. Leonard indicates that $ 652,670.06 was transferred out of one of petitioner's bank accounts at the Valley Bank of Nevada (Account No. 014072160) on July 10, 1981, by debit memorandum. Petitioner testified that the effect of this transfer was to extinguish a loan of Sorkis's and that $ 300,000 of the total amount *452 transferred represented a payment to Sorkis for his work in connection with the sale of the Aladdin. It is also significant that a statement for Recipients of Miscellaneous Income (Form 1099) reflecting petitioner as the payor, Sorkis as the recipient, and the amount of $ 300,00 to Sorkis for legal fees in 1981. Respondent next argues that a portion of the fees paid were not related to the Aladdin sale but that instead the fees were paid either as part of Sorkis's employment contract with the Aladdin, for personal services already rendered to petitioner, or for anticipated future services to petitioner. We disagree. Although some of the statements made at trial when viewed in isolation do tend to support respondent's position, when the testimony is examined in its entirety, it is clear that the $ 300,000 fee relates solely to legal work performed by Sorkis in connection with the sale of the Aladdin, and we so hold. As we have found that the fees were paid, and that they were paid in connection with the sale, it is proper, and the parties agree, that some adjustment be made to the basis in petitioner's Aladdin stock. See Third National Bank in Nashville v. United States,427 F.2d 343, 344 (6th Cir. 1970); *453 Neely v. Commissioner,85 T.C. 934, 953-955 (1985); Ward v. Commissioner,20 T.C. 332, 342-343 (1953), aff. 224 F.2d 547 (9th Cir. 1955); see also secs. 1.263(a)-2(e) and 1.453-1(b)(1), Income Tax Regs. We are not, however, of the opinion that the entire $ 300,000 should be added to the basis of petitioner's stock. Viewing the record as a whole [16] it is apparent that Sorkis's efforts benefitted not just petitioner, but all of the other Aladdin shareholders as well. To the extent the fees were paid by petitioner for the other shareholders they represented expenses paid for the benefit of others, for which petitioner would be entitled to reimbursement or contribution, and should not be added to the basis of his stock. See Welch v. Helvering, supra at 114 ("Men do at times pay the debts of others without legal obligation or the lighter obligation imposed by the usages of trade or by neighborly amenities, but they do not do so ordinarily * * *."); Deputy v. duPont,308 U.S. 488 (1940). [17] As petitioner was a 45.11278 percent shareholder at the time of the sale, it is appropriate that his stock basis *454 be increased by $ 135,338.34 ($ 300,000 x 0.4511278). Issue 5. The Gain Offset
The fifth issue for decision is whether petitioner should be allowed in 1981 an offset to the gain from sale of his Aladdin stock by the amount of an increased basis in the stock, in the full amount of such gain, as a result of alleged contingencies in 1981. Petitioner sold his interest in the Aladdin on September 30, 1980. The terms of the sale called for a down payment to be made at the closing with a series of notes payable to petitioner over a period of 14 years. The installment sale provisions of section 453 were elected by petitioner on his 1980 income tax return to apply to the gain realized *455 on the sale. Petitioner now asserts that as a result of various alleged contingencies occurring in 1981 he should be permitted to recover his cost basis in the stock prior to recognizing any gain in 1981. In support of this proposition he cites Burnet v. Logan,283 U.S. 404 (1931); Corn Exchange Bank v. United States,37 F.2d 34 (2d Cir. 1930); Cuba Railroad Co. v. Commissioner,9 T.C. 211 (1947); and sec. 15a.453-1(c)(4), Temp. Income Tax Regs., 46 Fed. Reg. 10715 (Feb. 4, 1981). Respondent argues that the above authorities are inapplicable and that it was proper to report the gain using the installment method for 1981. We agree with respondent. In a sale of personal property, gain is generally taxed in the year of sale. Sec. 1001. Under the installment method, however, the seller defers the recognition of income by including income ratably in the taxable years in which payments are received. Sec. 453. When the sale involves contingent payments, in some circumstances the "cost recovery" or "open transaction" method, whereby the seller recovers his basis first prior to reporting gain on the sale may be used. *456 [18] See Burnet v. Logan, supra.[19]
Petitioner invites us to apply the cost recovery method to the sale of his Aladdin stock so as to enable him to recover the basis in his stock prior to reporting gain for 1981. We decline such an invitation. The cost recovery method only applies *457 where the buyer's "promise of future money payments [is] wholly contingent upon facts and circumstances not possible to foretell with anything like fair certainty." Burnet v. Logan, supra at 414. Application of the cost recovery method is limited to rare and extraordinary circumstances, Estate of Wiggins v. Commissioner,72 T.C. 701, 708 (1979), and requires both (a) that the parties disagree and (b) that the property received have no readily ascertainable value. United States v. Davis,370 U.S. 65, 72 (1962). Here, petitioner has demonstrated no reason why he should be entitled to cost recovery reporting for the sale of his Aladdin stock. Clearly, the property sold had a readily ascertainable value as determined by the parties to the sale. The sales agreement called for a down payment of $ 1,293,793, and 168 fixed monthly payments aggregating $ 18,947,637 beginning July 1981 and ending September 1994, were to be made. In fact, the down payment as well as the four payments (aggregating $ 1,443,608) required in 1981 -- the year in issue -- were actually paid. Seven of the twelve payments due in 1982 in an aggregate amount of *458 $ 1,263,157 were also made. It is similarly significant that the payments were secured by a pledge by N&T of the Aladdin stock. Under these circumstances we find it difficult to believe -- at least at the time of the sale -- that petitioner sold his interest in the Aladdin in exchange for "contingent" payments and thus find that the Burnet v. Logan cost recovery method is wholly inapplicable to the facts of this case. [20]
*459 We are similarly unconvinced that the N&T installment obligation became worthless in 1981. Petitioner apparently argues that as a result of the potential adverse outcome of the Linton litigation (with the corresponding alleged possibility of the seizure of the Aladdin Hotel) and the management difficulties of N&T, the installment notes were of dubious collectability in 1981. We disagree. Even if there was a possibility that the Aladdin Hotel could be seized as a result of the Linton litigation, that matter was resolved favorable in November 1981 with a not guilty verdict as to one charge and the dropping of all other charges against the Aladdin. As for N&T, Mr. Newton and Mr. Torres, the two principals therein, may have had disagreements in 1981 but as petitioner testified, his payment expectations were contingent on whether Mr. Newton remained with N&T. In fact, Mr. Newton remained with N&T throughout 1981 and it was not until June 30, 1982, that he sold his interest to Mr. Torres. It is also significant that the installment payments did not become delinquent until 1982, and that the N&T bankruptcy did not occur until 1984. Whether some adjustment should be made in *460 the reporting of the installment obligation due to whole or partial uncollectability in years after 1981 is not our concern here. [21] The fact is, and the parties have stipulated, that all of the 1981 payments were timely made. We therefore agree with respondent and hold that petitioner should have continued to report the gain on the sale of his Aladdin stock using the installment method for 1981. [22]
Issue 6. The Investment Interest Expense
The sixth issue for decision is whether petitioner is entitled to a deduction of $ *461 238,587 for interest expenses incurred in 1981. The parties do not dispute that $ 238,587 of interest was paid by petitioner in 1981. Rather, the dispute centers on whether the limitations on investment interest deductions found in section 163(d) apply to the facts herein. Respondent argues that the limitations apply while petitioner predictable contends otherwise. Section 163(a) generally allows "as a deduction all interest paid or accrued within the taxable year on indebtedness." Section 163(d), however, limits a deduction for interest incurred on investment indebtedness, as follows: (1) In General. -- In the case of a taxpayer other than a corporation, the amount of investments interest * * * otherwise allowable as a deduction * * * shall be limited, in the following order, to -- (A) $ 10,000 * * *, plus (B) the amount of the net investment income * * *.
Section 163(d)(3)(D) defines "investment interest" as "interest paid or accrued on indebtedness incurred or continued to purchase or carry property held for investment." "Property held for investment," however, is not defined in section 163(d) or the regulations thereunder. [23]
*462 In determining whether property was held for investment, we have identified the applicable test as whether there was "substantial investment intent" in the acquisition or retention of the property. Miller v. Commissioner,70 T.C. 448, 455 (1978). See also W. W. Windle Co. v. Commissioner,65 T.C. 694 (1976), appeal dismissed 550 F.2d 43 (1st Cir. 1977), cert. denied 431 U.S. 966 (1977). [24] Although the issue in Miller arose under section 57, we noted that both sections 57 and 163(d) attempt to deal with the perceived abuse arising from the deductability of interest paid on loans obtained to finance investments that will ultimately produce capital gains, and thus the analysis contained therein is equally applicable here. Miller v. Commissioner, supra at 454 and 455. See also H. Rept. No. 91-413 (1969), 1969-3 C.B. 200, 245. *463 The extent to which investment rather than business considerations motivated the payment of interest is essentially a factual question. Miller v. Commissioner, supra at 456 (citing Corn Products Refining Co. v. Commissioner,350 U.S. 46, 51 (1955)). [25] Respondent's determination is presumptively correct and the burden of proving error is on petitioner. Helvering v. Taylor,293 U.S. 504, 515 (1935); Welch v. Helvering, supra; Rule 142(a).
Having considered the record in its entirety, we are of the opinion that petitioner has failed to prove that the interest payments involved should not be treated as investment interest. The evidence produced at trial was wholly inadequate. We do know that petitioner had various loans outstanding during 1981, but the purpose for which the proceeds of the loans were expended is not made clear. What little evidence is in the record suggests that at least a portion of the loan proceeds were used by petitioner to partially pay the legal fees incurred in the Linton litigation and the Aladdin *464 sale. The payment of these fees, however, represents payments by petitioner in connection with his investment in the Aladdin stock and in no sense relates to a trade or business carried on by petitioner. As the Supreme Court stated: "Devoting one's time and energies to the affairs of a corporation is not of itself, and without more, a trade or business of the person so engaged." Whipple v. Commissioner,373 U.S. 193, 202 (1963). [26] Thus, petitioner here cannot attempt to adopt the Aladdin's trade or business expenses of the Linton litigation as his own in order to escape the limitations of section 163(d). See also Miller v. Commissioner, supra at 459 n. 11. Similarly, the payment of the legal fees resulting from the Aladdin sale cannot be considered to be incurred in a trade or business [27] as they relate solely to the sale of his investment in the Aladdin stock. [28] Accordingly, we conclude that the interest paid on the loans obtained by petitioner constitutes investment interest subject to the limitations of section 193(d). Petitioner reported net investment income of $ 141,707 on his 1981 return and a carry over of unused investment interest *465 of $ 34,241 from 1980, which respondent has not challenged. Applying the computational provisions of section 163(d)(1), petitioner is entitled to an interest expense deduction of $ 151,707 for 1981, of which respondent has already allowed $ 34,241. *466 Issue 7. The Investment Tax Credit
The seventh issue for decision is whether petitioner is entitled to a $ 37,338 investment tax credit composed of rehabilitation expenditures and expenditures for new and used property placed in service in the Gateway Hotel in 1981. Petitioner argues that the expenditures have been properly substantiated and that the rehabilitation expenditures qualify as a "substantial rehabilitation," and thus the investment tax credit should be allowed in full. Respondent, on the other hand, asserts that the substantiation is insufficient and that the rehabilitation is not "substantial," and hence that the investment tax credit should not be allowed. We agree with petitioners. Petitioners bear the burden of proving that the expenditures took place in the amounts claimed. Welch v. Helvering, supra; Rule 142(a). We are of the opinion that petitioners met this burden. The uncontroverted evidence presented at trial consists of the testimony of Jay Churder, the chief engineer of the Gateway Hotel; a document prepared by him; and working papers prepared by Lopata, Lopata & Dubinsky, and by Debbie Sevier -- accountants for the Say-Web *467 Partnership. Mr. Churder, whom we found to be forthright, impressive, and entirely believable, testified at length regarding the extensive expenditures incurred for rehabilitation purposes and for new and used furniture. As is set out in our findings and below in connection with whether the expenditures were substantial, the expenses for rehabilitation incurred in 1981 consisted of the complete renovation of the upper and lower basements, the lobby, the front desk area, the mezzanine floor, and the first and fifteenth floors. Renovation of the first and fifteenth floors included the remodeling of over 44 rooms. [29] Mr. Churder also indicated that much of the existing furniture was salvaged but that new furniture was also purchased. We have reviewed the working papers supplied by the accountants and have found that these documents adequately support the figures claimed by petitioner. While it may be preferable, as respondent argues, to support the figures through the use of cancelled checks and invoices, we nevertheless note that the parties have stipulated that these documents *468 were prepared by the accountants for the project, apparently contemporaneously. On the basis of the above, we hold that the expenditures incurred by petitioner for rehabilitation, and for new and used furniture, have been adequately substantiated for the 1981 tax year. Respondent next argues that even if the amounts of the rehabilitation expenditures have been sufficiently proven, an investment tax credit for these amounts is not allowable since they cannot be considered "substantial." We disagree. As they read in pertinent part during the year in issue, [30] subparagraphs (1) and (2) of section 48(g) provided: (1) Qualified Rehabilitated Building Defined. -- (A) In General. -- The term "qualified rehabilitated building" means any building (and its structural components) -- (i) which has been rehabilitated,
(ii) which was placed in service before the beginning of the rehabilitation, and (iii) 75 percent or more of the existing external walls of which are retained in place as external walls in the rehabilitation process. * * * (2) Qualified Rehabilitation Expenditure Defined. -- (A) In General. -- The term "qualified rehabilitation expenditure" means any amount *469 properly chargeable to capital account which is incurred after October 31, 1978 -- (i) for property (or additions or improvements to property) with a useful life of 5 years or more, and (ii) in connection with the rehabilitation of a qualified rehabilitated building. * * * [Emphasis added.] *470 The main focus [31] of the parties' dispute is whether the Gateway Hotel was "rehabilitated" as required by section 48(g)(1)(A)(i). [32] In this context, the regulations provide that -- For a building to be considered rehabilitated, the rehabilitation must be substantial. Whether a rehabilitation is substantial is determined upon the basis of all the facts and circumstances. In general, to be substantial, the rehabilitation must do one of the following: (A) materially extend the useful life of the building; (B) significantly upgrade its usefulness (for either the same or a new use); or (C) preserve it in a way that significantly improves its condition or enhances its historic value. A substantial rehabilitation may vary in degree from gutting and extensive reconstruction of a building's major structural components to the cure of a substantial accumulation of major disrepairs. It may also include renovation, alteration, or remodeling for the conversion of a structurally sound building to a design and condition required for a new use. Cosmetic improvements alone, however, do not qualify as a substantial rehabilitation. [Sec. 1.48-11(b)(3)(ii), Income Tax Regs.] [33]
*471 Our research has not uncovered any court decision helping to further explain "substantial," but some guidance is found in examples (1) and (2) of section 1.48-11(b)(3)(v) of the Income Tax Regulations.[34] The first example indicates that the rehabilitation is not substantial (and thus the building is not considered rehabilitated) where individual air conditioning units for the windows of a building are replaced with a central air conditioning system. In the second example, however, the rehabilitation is considered substantial where new plumbing, wiring, heating, and air conditioning are installed; the layout of each of the ten floors is changed -- including the tearing down and building of new walls; new wall covering is put up; and new windows and flooring are installed. *472 In our view, the facts of this case fall closer to example 2 then example 1, and thus, we are of the opinion that the rehabilitation was substantial for the year in issue. We are persuaded that the expenses incurred significantly upgraded the usefulness of the Gateway Hotel. See sec. 1.48-11(b)(3)(ii)(B), Income Tax Regs. The expenditures involved consisted of renovations by 60 to 80 Say-Web Partnership employees of: (1) the lower basement -- including old machinery and the old "brine" system, as well as the installation of new concrete floors; (2) the upper basement -- including the creation of a new restaurant which involved the tearing out of old walls, rebuilding new walls, the installation of bathrooms, plumbing, a new electrical system, and new floor, as well as the renovation of the kitchen which involved repairing the floor and installation of new refrigeration, new walls, and a new electrical system; (3) the lobby -- including the removal of offices, rebuilding of bathrooms, replastering of walls, installation of a sound system, installation of new duct work for heating and air conditioning, and the complete renovation of the Terrace and Summit Rooms; (4) the front desk *473 area -- including the installation of walnut walls and the remodeling of all of the offices; (5) the mezzanine floor -- including the resurfacing of floors, the replastering of walls, and the installation of heating and air conditioning; and (6) the first, second, and fifteenth floors -- which involved tearing down and building new walls to make larger rooms, plastering new walls, and the installation of new wiring, plumbing, and carpeting for over 44 rooms. In light of these very extensive repairs undertaken in 1981, we are convinced that the "substantial" requirement has been satisfied, and we accordingly allow in full the claimed investment tax credit. Issue 8. The Negligence Addition
The final issue for decision is whether petitioners are liable for additions to tax pursuant to section 6653(a)(1) and (2). Section 6653(a)(1) provides that if any part of an underpayment of income tax is due to negligence or intentional disregard of rules and regulations, there shall be added to the tax an amount equal to 5 percent of the underpayment. Section 6653(a)(2) provides that an additional amount, equal to 50 percent of the interest payable under section 6601 with respect to *474 the portion of the underpayment that is attributable to negligence or intentional disregard of rules and regulations, shall also be added to tax. Respondent determined additions to tax in accordance with section 6553(a)(1) and (2) against petitioner relative to his 1981 tax year. As to such determinations, petitioner bears the burden of proving error. Enoch v. Commissioner,57 T.C. 781 802 (1972); Rule 142(a). On the basis of the record, we are satisfied that petitioner's underpayment was not due to negligence or intentional disregard off rules and regulations, but solely to a good faith misunderstanding of the law. Wofford v. Commissioner,5 T.C. 1152, 1166-1167 (1945). The issues involved were relatively complex, and there could be (and was) an honest difference of opinion. Yelencsics v. Commissioner,74 T.C. 1513, 1533 (1980); Belz Investment Co. v. Commissioner,72 T.C. 1209, 1233-1234 (1979), affd. 661 F.2d 76 (6th Cir. 1981). Petitioner on the whole was a credible witness and it is our opinion that his position with respect to the items involved was not untenable. Moreover, petitioner's *475 income tax return was prepared by an accountant and it appears that he relied in whole or in part on the accountant's advice. See Otis v. Commissioner,73 T.C. 671, 675 (1980). Accordingly, we hold that respondent should not have determined the addition to tax for negligence. To reflect the foregoing, as well as concessions, Decision will be entered under Rule 155.
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as in effect in the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, except as otherwise noted. ↩
*. 50 percent of the interest due on the determined deficiency. ↩
2. Patricia Webbe is a party to this action by virtue of having filed a joint individual income tax return and an amended joint individual income tax return for the 1981 tax year. For that reason we will hereinafter refer to Peter J. Webbe as petitioner. ↩
3. Petitioners filed an amended return for the 1981 tax year on December 7, 1982 (see infra).↩
4. A motion to dismiss the indictment was denied in United States v. Linton,502 F. Supp. 861 (D. Nev. 1980), affd. in part and dismissed in part 655 F.2d 930↩ (9th Cir. 1980). 5. There apparently is some confusion as to the exact amount paid to Mr. Shellow for legal services. Petitioner claims that Mr. Shellow was paid a total of $ 104,985.95, while respondent contends that he was paid $ 101,985.95. This discrepancy is the result of two checks, check number 1028 made out to Ben G. Saccenti in the amount of $ 1,400 and check number 1036 made out to Cashman's Cadillac in the amount of $ 1,600. Sharlo Leonard, the legal secretary for the Aladdin, testified at trial that the check made out to Cashman's Cadillac was a payment made on behalf of Mr. Shellow for legal services, but that she had no recollection of the check made out to Mr. Saccenti. For this reason, we have included the Cashman check in the amounts paid to Mr. Shellow but not the Saccenti check.↩
6. The participation of Don Carpenter, Jay Schulman, Burke & Smith and "others" in the litigation is not disclosed in this record. ↩
7. Petitioner contends that the actual amount transferred was $ 121,200. The difference between these two amounts, $ 7,500, is apparently a wire transfer taking place on September 17, 1981. Although the record does indicate that a wire transfer in such an amount did take place on September 17, it does not indicate the recipient of that amount, nor is that amount reflected in the summary of deposits into the Office Account. ↩
8. Petitioner and Richard Daly paid interest of $ 122,856.51 on this loan in 1981. Respondent concedes that 80 percent of the interest expense paid on this loan is properly attributable to petitioner. Accordingly, respondent agrees that during the year 1981 petitioner paid interest of $ 98,285.21 on the loan. ↩
9. The word "loan" appears on check no. 006 made out for $ 50,000 and dated July 31, 1981; and on check no. 1001 made out for $ 90,000 and dated August 25, both of which comprise a portion of the total $ 328,000 transferred. This notation, however, appears to have been included merely to indicate that these amounts were to be loaned from the account containing the $ 1.6 million loan to the Agent Account. ↩
10. In this regard petitioner testified as follows: Q After the sale -- well, had there been a resolution of the board of directors concerning the payment of [the Linton] legal fees before the sale? A There was a resolution. Q And have you been able to locate that? A No. It never has been returned. We requested Mr. Anderson of the strike force out in Las Vegas on numerous occasions to return the records which we never did get back from him. Q They were subpoenaed by the Grand Jury in Las Vegas? A That is correct. Q But you do recall such a resolution of the board of directors? A That is correct. * * * Q Okay. Thank you. You indicated that there was a resolution of the board of directors with regard to the payment of legal fees for that Linton case? A That is correct. Q Okay. And pursuant to that resolution were all of the shareholders bound to pay the legal fees which would be incurred? A Correct. ↩
11. Moreover, even if the financial condition of N&T or the Aladdin were such that reimbursement was not a realistic expectation, petitioner's payments would not have been deductable as a business expense. See Southern Pacific Transportation Co. v. Commissioner,75 T.C. 497, 566 n. 64 (1980); Roussel v. Commissioner,37 T.C. 235 (1961); Eskimo Pie Corp. v. Commissioner,4 T.C. 669 (1945), affd. per curiam 153 F.2d 301↩ (3d Cir. 1946), and authorities cited therein. 12. Out holding that the reimbursement clause in effect turned petitioner's payment into a loan, raises the question of whether the amount might nevertheless be deductible as a worthless debt pursuant to sec. 166. As neither party has addressed this issue, we choose to "adhere to the parties' view of the parameters of the controversy." George R. Holswade, M.D., P.C. v. Commissioner,82 T.C. 686, 698 (1984); see also Estate of Fusz v. Commissioner,46 T.C. 214, 215 n. 2 (1966). In any event, the evidence in the record that would support such a position is far from complete. The only evidence produced consists of the following testimony of petitioner: Q Okay. Did all of the shareholders contribute funds? A No, sir. Q Did all of the amounts which were contributed to the best of your knowledge which were paid to the various attorneys go through that agency account that Sorkis Webbe had set up at Missouri Bank? A No. There was other monies that came in I think from John Jenkins, from -- Johnny was a stockholder. Q Okay. A John Jenkins was in there. Then we had monies from the forfeiture money on the -- Q On the National Kinney sale? A National Kinney. Q Okay. did you attempt to collect any amounts from any of the other shareholders? A No. Q Why not? A Well I figured when all the trouble is over I will go and speak with them, but at this point -- Q Okay. A Probably won't be able to get anything anyway. * * * Q And did you expect that you would receive any of those monies -- when you filed your tax return did you have any reasonable expectation that you would get anymore money back from the other stockholders? A No. I definitely would not get anything from the other stockholders.
We do not know the amount of the worthless portion of the debt (e.g., the amounts contributed by John Jenkins or from the National Kinney sale are not made clear in the record), when the debt became worthless, or any of the other elements of sec. 166. Accordingly, as petitioner has failed to prove that sec. 166 is applicable, respondent's disallowance of the deduction will be sustained. See Hessert v. Commissioner,↩ a Memorandum Opinion of this Court dated April 22, 1943. 13. This issue was apparently raised by petitioner for the first time on brief. As evidence was presented on this issue and as both parties have argued it on brief, we deem it tried by consent pursuant to Rule 41(b). ↩
14. Petitioner admits both in his pretrial memorandum and his opening brief that the miscellaneous expenses of $ 2,844 were incurred in connection with the Linton↩ litigation. 15. The Eighth circuit, to which an appeal would lie in the instant matter, has indicated that we are to accept uncontradicted evidence that is "competent, relevant and credible * * *." Banks v. Commissioner,322 F.2d 530, 537↩ (8th Cir. 1963). 16. At one point at trial petitioner appeared to suggest that Sorkis also performed some legal services for him in his individual capacity. After carefully scrutinizing both his and Ms. Leonard's testimony, however, we are convinced that the work done in connection with the Aladdin sale -- for which the $ 300,000 was paid -- was for the shareholders of the Aladdin rather than for petitioner individually.↩
17. See also Snyder Brothers Co. v. Commissioner,T.C. Memo. 1980-275↩. 18. Use of the cost recovery method was severely limited by the Installment Sales Revision Act of 1980, 94 Stat. 2247. See sec. 453(j)(2); S. Rept. No. 96-1000 (1980), 1980-2 C.B. 949; secs. 15a.453-0 and 15a.453-1(a), 46 Fed. Reg. 10709 (Feb. 4, 1981). See generally 2 Mertens, Law of Federal Income Taxation, sec. 15.25 pp. 72-75 (rev. 1985); Goldberg, "Open Transaction Treatment for Deferred Payment Sales after the Installment Sales Act of 1980," 34 Tax Law. 605 (1981). As the sale of the Aladdin Act took prior to the effective date of the Act (October 19, 1980) these revisions are not applicable to the facts herein. See sec. 6(a)(2) of the Installment Sales Revision Act of 1980, supra↩ at 2256.
19. See and compare In re Steen,509 F.2d 1398 (9th Cir. 1975); Gralapp v. United States,↩ 458 F2.d 1158 (10th Cir. 1972). 20. Compare Ehlers v. Vinal,382 F.2d 58 (8th Cir. 1967) and Royster v. Commissioner,T.C. Memo. 1985-258 (cost recovery method not applied) with McShain v. Commissioner,71 T.C. 998 (1979) (cost recovery method applied). The two other cases cited by petitioner, Corn Exchange Bank v. United States,37 F.2d 34 (2d Cir. 1930), and Cuba Railroad Co. v. Commissioner,9 T.C. 211 (1947), are similarly inapplicable. Each of these cases involved whether an accrual basis taxpayer should accrue items of income where collection was doubtful. As petitioner is a cash basis taxpayer, these cases have no application to our facts. Petitioner also relies on sec. 15a.453-1(c)(4), Temp. Income Tax Regs. This regulation, however, only applies to sales occurring after October 19, 1980 and thus has no application to the September 30, 1980 sale involved here. Sec. 15a.453-0, Temp. Income Tax Regs. In any event, the regulation only applies to "contingent payment sales" as defined as any "sale or other disposition of property in which the aggregate selling price cannot be determined by the close of the taxable year in which such sale or other disposition occurs." Sec. 15a.453-1(c)(1), Temp. Income Tax Regs., 46 Fed. Reg. 10711↩ (Feb. 4, 1981). As we have indicated in the text, it is clear that the selling price was accurately determinable at the close of the year of sale and considered a contingent payment sale. 21. For appropriate adjustment of the gross profit ratio in later years where the installment obligation becomes wholly or partially worthless, see generally sec. 15a.453↩-1(c)(2)(i)(A), Temp. Income Tax Reg.; 2 Mertens, Law of Federal Income Taxation, sec. 15.26 p. 76 (rev. 1985). 22. See Curran v. Commissioner,T.C. Memo. 1984-92, affd. without published opinion 774 F.2d 1173 (9th Cir. 1985). Obviously, in light of our decision to add a portion of the Aladdin legal fees to the basis of petitioner's stock, some adjustment should be made to the gross profit ratio for 1981. See sec. 1.453-1(b)(1), Income Tax Regs.↩
23. See Boseker v. Commissioner,T.C. Memo. 1986-353↩. 24. Some guidance may be found in sec. 1.57-b(2), Prop. Income Tax Regs., 35 Fed. Reg. 19767 (Dec. 30, 1970). Although our opinion does not conflict with these proposed regulations, we do not rely upon them as authority, as they "carry no more weight than a position advanced on brief by the respondent." F. W. Woolworth Co. v. Commissioner,54 T.C. 1233, 1265-1266 (1970); Miller v. Commissioner,70 T.C. 448, 460 (1978). See also Driggs v. Commissioner,87 T.C. 759, 771↩ n. 10 (1986). 25. See also Schanhofer v. Commissioner,T.C. Memo. 1986-166↩. 26. See also Perlman v. Commissioner,27 T.C. 755 (1957), affd. 252 F.2d 890 (2d Cir. 1958); Eskimo Pie Corp. v. Commissioner, supra;Yamamoto v. Commissioner,T.C. Memo. 1986-316↩. 27. Of course, it is also significant (as we previously discussed) that the funds used by petitioner to pay the Linton legal fees were in reality not incurred↩ by him since they were required to be reimbursed by the Aladdin and/or N&T. 28. The following quote taken from Miller v. Commissioner, supra at 455, is particularly relevant: In W. W. Windle Co. v. Commissioner,65 T.C. 694, 714 n. 15 (1976) * * * this Court noted that "stock is normally a capital asset" owned for investment purposes, and held that only where the "original purpose of [the] acquisition and the reason for continued retention are both devoid of substantial investment intent should the stock be treated otherwise." * * * This test is also applicable here to determine whether the BNB stock was "held for investment." If the stock was held with sufficient investment intent to result in a capital gain upon its disposition, then the abuses resulting from the use of borrowed money to acquire capital assets, which Congress sought to prevent in enacting section 57, are present. Applying a different standard requiring a greater degree of investment intent * * * would frustrate congressional policy. The minimum tax would be inapplicable to a loan incurred to purchase property which, because of the owner's substantial investment intent, would produce capital gains upon disposition. [Fn. ref. omitted.]
We have no doubts here that petitioner's intent in holding the Aladdin stock was to produce a capital gain on sale and thus cannot be considered to be "devoid of substantial investment intent." ↩
29. As our findings reveal, the second floor was at least partially renovated in 1981 as well. ↩
30. Sec. 48(g)(1)(A) was amended by sec. 212(b) of the Economic Recovery Tax Act of 1981, 95 Stat. 236-237, to read in pertinent part as follows: (1) Qualified Rehabilitated Building Defined. -- (A) In General. -- The term "qualified rehabilitated building" means any building (and its structural components) -- * * * (i) which have been substantially rehabilitated.
(C) Substantially Rehabilitated Defined. -- (i) In General. -- For purposes of subparagraph (A)(i), a building shall be treated as having been substantially rehabilitated only if the qualified rehabilitation expenditures during the 24-month period ending on the last day of the taxable year exceed the greater of -- (I) the adjusted basis of such property, or (II) $ 5,000. The adjusted basis of the property shall be determined as of the beginning of the first day of such 24-month period, or of the holding period of the property (within the meaning of section 1250(e)), whichever is later. [Emphasis added.]
As such, the "facts and circumstances" test as discussed in the ensuing text was replaced by an objective test whereby the rehabilitation qualifies as "substantial" only if the expenditures during the specified 24-month period exceed the greater of (1) the adjusted basis of the property or (2) $ 5,000. This amendment was expressly made applicable only to expenditures incurred after December 31, 1981 (see sec. 212(e) of the Economic Recovery Tax Act of 1981, supra↩ at 239-240), and thus has no applicability to the expenditures involved here. 31. On brief, respondent appears to suggest that the credit should not be allowed since there is no basis in the record for determining: (1) the useful life of the property, as required by sec. 46(c)(2) or when the property was placed in service, as required by sec. 46(c)(1). A careful review of the record satisfies us that these elements are present. ↩
32. A requirement of this type apparently first appeared in (now repealed) sec. 167(o). See 8 Mertens, Law of Federal Income Taxation, sec. 32A p. 73 n. 50 (rev. 1985). ↩
33. This regulation applies to expenditures occurring prior to January 1, 1982, and thus is applicable to the amounts incurred here. See sec. 1.48-1(e), Income Tax Regs.↩
34. The complete text of those examples is as follows: Example (1). Taxpayer A is the owner of a 30-year old building. The building is air conditioned by means of window air conditioning units. A replaces the window units with a central air conditioning system and no other rehabilitation is performed by A. The expenditures incurred by A did not materially extend the building's useful life, significantly upgrade its usefulness, or preserve it in a manner that significantly improves its condition or enhances its historic value. Although expenditures for replacement of window units with a central air conditioning system may constitute qualified expenditures as part of an overall rehabilitation, alone they do not qualify as a substantial rehabilitation and the building is not considered rehabilitated within the meaning of this subparagraph. Example (2). Taxpayer B is the owner of a 10 story office building that is 35 years old. The building is in substantial disrepair and in order to modernize it as an office building B installs new plumbing, electrical wiring, and heating and air conditioning systems. In addition, the layout of each floor is changed by means of tearing down many existing interior walls and partitions and building new walls, partitions, and doors. Old plaster is removed from many walls and replaced by new wall covering. New windows and new flooring are installed throughout the building. The improvements made by B materially extend the useful life of the building and significantly upgrade its usefulness. The building is considered rehabilitated within the meaning of the facts and circumstances test in this subparagraph. [Sec. 1.48-11(b)(3)(v), exs. 1 & 2, Income Tax Regs.↩]