874

CHRISTOPHER P. RECKLITIS, PETITIONER *v.*
COMMISSIONER OF INTERNAL REVENUE,
RESPONDENT

Docket No. 24351-84.          Filed November 7, 1988.

*Albert F. Cullen, Jr.,* for the petitioner.
*Lewis R. Mandel,* for the respondent.

NIMS, *Chief Judge:* Respondent determined the following
deficiencies and additions to tax in petitioner's 1974 and
1975 Federal income tax:

| Year | Deficiency | Additions to tax | |
| | | [1]Sec. 6653(b) | Sec. 6654 |
| --- | --- | --- | --- |
| 1974 | $1,023,854.30 | $511,927.15 | $32,684.76 |
| 1975 | 1,532,711.14 | 766,355.57 | 66,053.40 |

Petitioner admits tax liability for the following items of gross income: $57,250 (1974) and $27,500 (1975) received from SCA as wages; $40,000 received or paid annually on his behalf during 1974 and 1975 by Trans World Services, Inc., pursuant to the terms of a 15-year consulting and noncompetition agreement; $400,000 of gain from the 1974 Cyrano land transaction; and unexplained bank deposits in the amounts of $26,152 and $37,561 during the respective 1974 and 1975 tax years.

After concessions, the issues for decision are: (1) Whether the various land sales directed by petitioner caused him to recognize gross income; (2) whether cash payments made to petitioner by his corporate employer, SCA Services, Inc., may be excluded from gross income as reimbursed business expenses; (3) whether petitioner contributed his TWS stock to Carlton House Corp. prior to the sale of the TWS stock to third parties; (4) whether cash advances made by petitioner to Carlton House Corp. constituted bona fide loans which gave rise to bad debt deductions; (5) whether petitioner is liable for additions to tax under section 6653(b) for 1974 and 1975, or, in the alternative, whether petitioner is liable for additions to tax under sections 6651(a)(1) and 6653(a); and (6) whether petitioner is liable for additions to tax under section 6654 for 1974 and 1975.

## FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly. The stipulation of facts and attached exhibits are incorporated herein by reference.

Petitioner resided at Boxford, Massachusetts, at the time he filed his petition.

Petitioner is a well-educated and highly successful businessman. Many of the issues before us arise out of transactions entered into by petitioner and three businesses

---

[1] Unless otherwise indicated, all section references are to sections of the Internal Revenue Code as in effect during the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.

he either founded or significantly developed. In the interest of understanding these transactions, we deem it appropriate to summarize petitioner's involvement in SCA, TWS, and Carlton prior to 1974, the first taxable year in issue.

## General Background

While pursuing combined studies at Massachusetts Institute of Technology and Amherst College, petitioner became involved in a six-person maintenance company. He gradually progressed in the company and was given a one-third ownership interest. Sometime later, petitioner acquired the other two-thirds of the maintenance company stock and renamed the company Consolidated Service Corp. (CSC). Over the next few years, under petitioner's direction, CSC effected several acquisitions and greatly expanded its operations. By 1971, CSC had become a full-scale maintenance business with janitorial services, window cleaning services, security services, and disposal services. It employed a work force of 2,000 persons and generated annual revenues in excess of $7 million. Overseeing the activities of CSC occupied the major portion of petitioner's time.

During 1963, petitioner joined with a couple of classmates and two others to form Trans World Services (TWS), a company which subsequently developed the sandwich wrap utilized in vending equipment. Petitioner owned approximately 62 percent of the TWS stock, but was not a salaried employee. His activities were limited to those of a company director.

In 1964, petitioner and another individual acquired a hotel and started Carlton Hotel Corp. as a hotel holding company (Carlton). Petitioner initially owned approximately 80 percent of Carlton. Petitioner assumed the role of Carlton's president for a period of time following its formation, but soon turned the management responsibilities over to Alfred Weiner, son of the former owner and operator of the Ritz Carlton. Weiner operated Carlton until late 1973 or early 1974 when petitioner reassumed the position of president and increased his ownership to approximately 93 percent.

From formation in 1964 through 1971, Carlton acquired six additional hotels, four being acquired during 1971. Each

of the seven hotels was operated as a separate subsidiary of Carlton. The rapid expansion of Carlton often created temporary cash-flow problems, particularly following the 1971 acquisitions which more than doubled the number of operating hotels. Petitioner would often advance Carlton the cash it needed to meet its operating needs. Petitioner also on occasion advanced funds to his other business interests. Prior to 1971, petitioner regularly received repayment of his advances. CSC also loaned cash to Carlton. The advances made by CSC and its successor SCA were bona fide loans. However, during 1971 Carlton attempted to acquire independent and more permanent sources of funds through refinancing the appreciated real estate of its subsidiaries. It simultaneously entered into merger negotiations with several established hotel chains. Neither the refinancing nor the merger negotiations were completed.

During 1971, the operations of CSC and Carlton became increasingly entwined. Petitioner purchased a building within which to house centralized accounting and administrative functions for the two firms. The two companies also began rendering services to one another, and intercompany transfers of cash became common. As of the end of 1971, CSC had advanced approximately $400,000 to Carlton.

Sometime during 1971, petitioner arranged for CSC to be acquired by S.C.A. Services, Inc. (SCA), this combination being the first of several steps in a plan to operate a publicly owned conglomerate in the waste service industry. Under the terms of the acquisition, petitioner became president, director, and treasurer of SCA with an annual salary of approximately $50,000 plus expenses. As president, he was responsible for directing acquisitions and integrating the acquired assets into SCA's waste management business. Petitioner also received assurances that SCA would continue to provide goods, services, and short-term cash advances to Carlton. However, because SCA was publicly traded, it was agreed that petitioner would not assume the position of president of the public company until the CSC loan to Carlton (which was transferred to SCA) was repaid.

To provide Carlton with funds to repay its loan, SCA caused the First National Bank of Boston to lend petitioner

$1 million (the Boston loan) on a demand note bearing interest at 1 percentage point over prime. The demand note was secured by 65,000 shares of petitioner's SCA stock.

In about February 1972, petitioner transferred essentially all of the Boston loan proceeds to Carlton. The transferred funds were recorded on Carlton's books in the "due to/due from" current liability account. No note or other writing was executed by Carlton in connection with petitioner's advance. Likewise, Carlton made no commitment regarding repayment terms or interest. Shortly after petitioner's advance, Carlton repaid the CSC loan and petitioner assumed his role as president of SCA.

After taking the reins of SCA in early 1972, petitioner was "swept away" in an acquisition frenzy that brought over 50 companies into the SCA family within a short 6-month period. This rapid expansion vaulted SCA onto the New York Stock Exchange by the end of 1972. The expansion continued during 1973, growing to 127 acquisitions, approximately 100 of which were personally handled by petitioner. Understandably, directing and approving the expansion of SCA fully occupied petitioner's time during 1972.

Carlton continued to borrow funds and receive services from SCA during 1972. Consequently, during the summer of 1972 and approximately 6 months after the Boston loan was made to petitioner, a second demand loan in the amount of $450,000 was arranged by SCA for petitioner from the Union Trust Bank in Maryland (the Union Trust loan). Petitioner similarly advanced the proceeds of the Union Trust loan to Carlton, and the SCA loan was repaid. Carlton's borrowing from SCA, however, did not subside. By February 1973, petitioner was again requested to have Carlton repay the outstanding SCA debt. To this end, petitioner obtained a third demand loan in the amount of $1 million from the First National State Bank of New Jersey (the New Jersey loan) and advanced the proceeds to Carlton. Petitioner's advance of the New Jersey loan proceeds to Carlton brought his total advances to approximately $2,450,000. To secure the debt incurred to obtain the funds advanced to Carlton, petitioner had pledged approximately 300,000 shares of SCA stock (worth an estimated $8

million in January 1973) and an undisclosed amount of Polaroid stock.

During 1973, Carlton embarked on a substantial and costly renovation plan to change its hotel restaurant operations to lounge-type operations featuring major entertainment acts. Financing in the amount of $1,700,000 was advanced by SCA. Carlton was unable to repay the SCA loan as requested in early 1974. Moreover, as a result of a plunging stock market that reduced the value of petitioner's pledged stock to under $1 million (less than 50 percent of the borrowed principal it secured), petitioner was unable to borrow additional funds to advance to Carlton. To prevent the banks from selling petitioner's pledged 300,000 shares of SCA stock into a depressed market, many of SCA's officers and directors personally guaranteed petitioner's outstanding bank loans. In addition, petitioner tendered a million dollar second mortgage on the Carlton House of Lynn, the operating hotel of one of Carlton's subsidiaries, as additional collateral. The $1,700,000 SCA loan was unaffected by the guarantees or second mortgage.

Believing that the disclosure of a $1,700,000 SCA loan to Carlton would injure the roughly 200 investors he had personally brought into SCA as director of acquisitions, petitioner resolved to remove the loan from the books of both SCA and Carlton. To obtain the funds necessary for Carlton to retire the debt owed SCA, petitioner transferred TWS stock to Carlton and caused SCA to participate in three land acquisition transactions during 1974 and 1975. These transactions, referred to subsequently as the "Cyrano," "Bentro," and "Amesbury" land sales, involved the acquisition by SCA of various assets for prices which exceeded market value. The purchase price paid in excess of market value was then directed to Carlton to be used in repayment of the SCA debt. These transactions will be discussed in chronological order.

## Land and Stock Transactions

### Cyrano Land Sale

In 1973, an employee of SCA notified petitioner that a 36.81-acre parcel of land located in Amesbury, Massachu-

setts, was available for sale at approximately $1,000 an acre. Petitioner did not direct SCA to acquire the property (hereinafter referred to as the Moore Property) from its owner, a Mr. Moore. Instead, on or about June 25, 1973, an entity called Willmac Realty Trust (Willmac) purchased the Moore Property from Moore. Subsequent to Willmac's acquisition of the Moore Property, SCA formed a subsidiary called Cyrano Corp. (Cyrano) for the purpose of acquiring the Moore Property from Willmac. Cyrano purchased the parcel of land from Willmac in 1973 for $504,000, which included a downpayment of $104,000. The remaining $400,000 purchase price was paid during 1974 to alleged representatives of Willmac and subsequently diverted at the direction of petitioner into Carlton's bank account at the First National Bank of Boston.[2] During late September 1974, petitioner caused Carlton to issue a check payable to SCA in the amount of $330,000. Due to insufficient funds in the Carlton account, the check was not honored. Petitioner subsequently obtained a 120-day personal loan in the amount of $300,000 from Mickey Adelman (the Adelman loan) as a condition of Adelman's acquisition of an SCA subsidiary. This loan permitted petitioner to substitute his personal check for the "bounced" Carlton check and reduce the SCA loan amount owed by Carlton.

*Petitioner's Transfer of TWS Shares to Carlton*

In 1974, petitioner held 1,641½ shares of TWS stock with a basis of $25,021.50. Petitioner's ownership exceeded 50-percent of TWS's outstanding shares. An additional 97½ shares of TWS stock were held by the D & R Realty Trust (D & R). Petitioner was trustee of D & R, and his mother was the trust's sole beneficiary.

Sometime during the summer of 1973, petitioner began negotiations with TWS to sell back his TWS stock. During 1974, SCA, acting on behalf of petitioner, continued to negotiate the purchase or redemption of petitioner's TWS

---

[2]It is unclear from the record whether this bank account was generally used by Carlton or in existence as of November 1974. As discussed *infra*, we have found based upon the testimony of Robert Kelley, a CPA who worked part-time for Carlton, that no separate bank account was maintained by Carlton during late 1974 and 1975. Therefore, we find that the advances derived from the Bentro land sale were deposited in an account maintained by Carlton House of Lynn.

stock. By mid-August 1974, negotiations were finalized regarding the transfer of petitioner's TWS stock to TWS and its shareholders (the TWS group). The agreement required transfer of both petitioner's and D & R's TWS stock. The transfer of stock was subsequently effected in three steps. First, on August 14, 1974, petitioner, acting as trustee, transferred D & R's 97½ shares of TWS stock to Carlton. No consideration was received by the D & R trust for the $25,230-valued TWS stock. Second, on August 19, 1974, petitioner transferred his own 1,641½ shares of TWS stock to Carlton. The value of this contributed stock was not added to the "due to/due from" account. Rather, petitioner was "advised" that both transfers of TWS stock would be treated as contributions to Carlton's capital. Carlton issued no additional stock to petitioner. Third, on or about the day petitioner transferred his TWS stock to Carlton, Carlton resold its 1,739-share block of stock to the TWS group for $450,000. Carlton did not, however, report the sale of TWS stock on its 1974 consolidated Federal income tax return. The $450,000 sales proceeds were applied to reduce Carlton's outstanding SCA loan balance. This $450,000 payment, combined with the $300,000 payment made by petitioner with the proceeds of the Adelman loan, reduced the balance of the Carlton debt to approximately $1 million, as reported by SCA on its proxy statement printed October 2, 1974.

An additional condition in the TWS stock transfer negotiation provided petitioner with a 15-year consulting and noncompetition agreement. Under the consulting agreement, TWS was to pay petitioner $40,000 annually on October 15. The required payment was received by or paid on behalf of petitioner during both 1974 and 1975. TWS also agreed to maintain a 15-year decreasing term life insurance policy in the original amount of $200,000 on petitioner's life, payable to a beneficiary named by petitioner.

*Bentro Land Sale*

On or about September 30, 1974, Anthony Bentro (Bentro) caused a company called Lad Landfill, Inc. (Lad), to be incorporated in New York. On the following day, Bentro or Lad purchased a landfill in Utica, New York, for

$325,000. Approximately 4 weeks later, Bentro entered into an agreement with B & B Sanitation, Inc. (B & B), a wholly owned subsidiary of SCA previously sold to SCA by Bentro, to transfer the Utica landfill for $1,265,000. B & B also agreed to acquire equipment and other assets from Lad. Petitioner represented SCA in structuring and approving the acquisition of the landfill by B & B.

Of the $1,265,000 Bentro or Lad received from SCA for the purchase of the landfill and other assets, $965,000 was retransferred to Carlton as follows:

| Date | Amount |
|---|---|
| November 1974 | [3]$175,000 |
| January 31, 1975 | 636,000 |
| April 20, 1975 | 20,000 |
| May 1, 1975 | 134,000 |

However, since Carlton did not have its own bank account during November 1974 and 1975, the advances were deposited in an account maintained by Carlton House of Lynn, Inc., a subsidiary of Carlton, at Liberty Bank & Trust Co. A portion of the advanced funds was used to discharge the $300,000 Adelman loan described previously. At least $175,000 was credited to the due to/due from account on Carlton's books. No record exists of any repayment terms, interest rate, or payment of interest or principal being made on the Lad advances. However, when Carlton House of Lynn, Inc., entered into bankruptcy proceedings under chapter 11 of the Bankruptcy Act, 11 U.S.C. sec. 701 et seq. (1976), Bentro and Lad filed an unsecured claim against the debtor (i.e., the subsidiary) in the amount of $965,000. Their claim was initially disputed by the debtor on the ground that funds creating the claim were advanced to Carlton (i.e., the parent holding company) as an equity interest. The claims of Bentro and Lad were subsequently settled for $100,000.

---

[3]We note that the parties stipulated the amount of the November 1974 advance to be $153,350. We do not lightly disregard stipulated facts, but where such facts are clearly contrary to facts disclosed by the record, we refuse to be bound by the stipulation. *Jasionowski v. Commissioner,* 66 T.C. 312, 318 (1976). We find the record clearly discloses November 1974 advances of $175,000.

*Amesbury Property Purchase*

As of March 31, 1975, the end of Carlton's fiscal year, Carlton's debt to SCA had once again increased to $1,200,000. About this time, SCA's independent auditors from Arthur Young & Co. advised petitioner that SCA's financial position was degenerating. The auditors took the position that unless the $1,200,000 owed to SCA was repaid, the loan might have to be reserved and disclosed specifically on the Form 10K filed with the Securities Exchange Commission (SEC). Moreover, the auditors, as a result of an anonymous telephone call received by the SEC, commenced a more extensive audit of SCA than they had performed in the prior year. This audit disclosed that the cash advances made to Carlton had been misclassified on the prior year's books, annual reports, and SEC filings as a trade receivable made in the ordinary course of business. Consequently, SCA's board of directors informed petitioner that he had to bring about repayment of the $1,200,000 by June 30, 1975, the date SCA's Form 10K had to be filed with the SEC. Petitioner was directed not to return to work at SCA until the debt was repaid.

To raise the capital necessary to repay Carlton's $1,200,000 debt to SCA, petitioner, on or about May 22, 1975, caused three corporations, J.C. Development Corp. (J.C.), Essex Land Trust Realty & Development, Inc. (Essex), and DIOC Diversified, Inc. (DIOC) to be incorporated in Massachusetts for the purpose of purchasing several tracts of land totaling 149 acres, hereinafter referred to as the "Amesbury parcels." J.C. and Essex were owned by DIOC, the chief stockholder of which was Eli G. Mavros, the attorney who incorporated the three corporations at petitioner's request.

Approximately 1 day after the three corporations were formed, SCA through Burton Steir, chairman of the board of directors and chief executive officer of SCA, agreed to purchase the Amesbury parcels from J.C. and Essex and deposited $200,000 toward the purchase price. Within a week, J.C. and Essex used $130,000 of the deposit to acquire the Amesbury parcels. On the following day, the Amesbury properties were resold to SCA for a total pur-

chase price of $1,463,000. J.C. and Essex made a combined $1,333,000 profit from this transaction.

Over the course of the next month, approximately $1,200,000 of the $1,333,000 profits attributable to the Amesbury parcels were transferred from J.C. and Essex to holding company DIOC. On June 20, 1975, Carlton issued 398 shares of common stock to Mavros in exchange for all 12,500 outstanding shares of DIOC.[4] As a condition to the exchange, petitioner agreed to contribute all outstanding Carlton advances in excess of $2 million to the capital of Carlton. On June 24, 1975, DIOC channeled the $1,200,000 Amesbury profits it controlled to Carlton, its new parent corporation. Carlton used the $1,200,000 to extinguish its outstanding debt to SCA. The balance of the profits retained by J.C. and Essex was used to pay mortgage debts owed by Carlton to third parties. Petitioner personally guaranteed certain indebtedness of Carlton during 1974 and 1975.

After completing the Amesbury transaction, petitioner resigned from the position of president of SCA and devoted himself once again to Carlton, which as a result of foreclosures and other transactions occurring during 1974 and 1975 had contracted from seven to two operating hotels: Carlton House of Lynn, Inc., and Carlton House of Wrentham, Inc. These subsidiaries continued to operate until about March 1976, when they sought protection from creditors under chapter 11 of the bankruptcy law. Carlton (the holding company) never sought bankruptcy protection. Both operating hotels emerged from bankruptcy under a plan of reorganization in early 1977. As part of the reorganization of Carlton House of Lynn, Inc., petitioner elected not to file a proof of claim as to alleged debts due him. The revitalization of the subsidiaries, however, was short lived as inclement weather caused unexpected vacancies. Neither subsidiary generated sufficient funds to pay its creditors and otherwise comply with the terms of the plan of reorganization. Both subsidiaries ceased to exist in early 1978.

---

[4]While the agreement attempts to qualify the exchange as a sec. 368(a)(1)(B) reorganization, neither party has raised the tax consequences of this exchange; accordingly, we offer no opinion thereon. Likewise, we offer no opinion on the application of sec. 351 to the transaction.

### Petitioner's Criminal Conviction and Civil Judgment

As a result of the land transactions described above involving SCA and Carlton, petitioner pled guilty to three counts of a 1979 Federal indictment alleging willful filing of false and misleading securities statements with the SEC and the defrauding of SCA through the Cyrano, Bentro, and Amesbury transactions, violations of 18 U.S.C. secs. 2 and 1341 (Supp. III 1979) and 15 U.S.C. sec. 78(m) and (ff) (Supp. III 1983). Likewise, SCA, alleging self-dealing, fraud, and breach of fiduciary duties, obtained a civil judgment against petitioner in the amount of $2,758,000 for his role in the land sales transactions. The $2,758,000 judgment was based on (1) the $400,000 diverted by petitioner in the Cyrano transaction, (2) the $1,025,000 diverted by petitioner in the Bentro transaction,[5] and (3) the $1,333,000 diverted in the Amesbury transaction.

### Petitioner's Reimbursements From SCA

Petitioner received additional payments from SCA in the amounts of $40,007 and $26,806 during the years 1974 and 1975, respectively. These payments were made by SCA upon receiving a summary of alleged business expenses incurred by petitioner. Petitioner would typically summarize the various expenses he incurred (e.g., telephone calls, tolls, mileage, meals, and airline tickets) on a yellow legal-sized sheet. To this sheet he would generally attach flight tickets, receipts, and telephone bills with certain calls identified. Petitioner did not, however, specifically write "business expenses" on the attached receipts or indicate a business purpose served by the expenditure. Petitioner's secretary, Elaine Watt, would total petitioner's figures, summarize them on a cover sheet, and submit them to SCA's accounting department for payment. Following the submission of petitioner's reimbursement requests, SCA made payments directly to petitioner.

### Petitioner's Failure To File Returns for 1974 and 1975

Petitioner filed a Federal income tax return for the year 1973. He also filed an extension of time to file his tax

---

[5]We note that contrary to our finding that B & B purchased the Bentro landfill and related assets for $1,265,000, which was based on the stipulation of the parties, the civil suit alleged that total payments amounted to about $1,350,000.

return for both 1974 and 1975. He did not, however, file a Federal income tax return for the years 1974 and 1975.

As an employee of SCA, petitioner was issued Forms W-2 which specified that compensation in the amounts of $57,250 and $27,500 had been paid to him for the years 1974 and 1975, respectively. However, because petitioner had filed Forms W-4E, Exemption from Withholding, with SCA for 1974 and 1975, SCA withheld no Federal income tax from petitioner's salary for these years.

OPINION

*Issue 1. Did Petitioner Receive Gross Income From the Bentro and Amesbury Land Transactions?*

Petitioner, as SCA's president, caused SCA to engage in several land transactions with associates or entities under his control. In each transaction, SCA purchased land parcels for amounts greatly exceeding fair market value. The sales proceeds in excess of market value were then transferred by a roundabout route to Carlton, a hotel corporation in which petitioner held 93 percent of the shares. Carlton then used the siphoned-off SCA cash to repay SCA and various other creditors.

Respondent determined that petitioner realized gross income from the Bentro land sales in the amounts of $759,925 and $790,000 for 1974 and 1975, respectively. He likewise determined that petitioner realized an additional $1,333,000 of gross income from his participation in the Amesbury property sales. We must decide whether petitioner's orchestration of the various land sales transactions should cause the generated gross income to be chargeable to petitioner.

Section 61 provides that "gross income means all income from whatever source derived." The Supreme Court has clarified that gross income occurs when there is an accession to wealth, clearly realized, and over which the taxpayer has complete dominion. *Commissioner v. Glenshaw Glass Co.*, 348 U.S. 426, 431 (1955). It matters not whether the accession to wealth is unlawful or whether the taxpayer may be adjudged liable to restore its equivalent. *James v. United States*, 366 U.S. 213, 219 (1961); *North American Oil*

*v. Burnet,* 286 U.S. 417 (1932). Moreover, "it is of little consequence that [Taxpayer] personally received no money from the transaction, for it is the power to dispose of income and the exercise of that power that determines whether taxable income has been received." *Hardin v. United States,* 461 F.2d 865, 872 (5th Cir. 1972). "The taxpayer has equally enjoyed the fruits of his labor or investment [or misappropriation of funds] and obtained the satisfaction of his desires whether he collects and uses the income to procure those satisfactions, or whether he disposes of his right to collect it as the means of procuring them." *Helvering v. Horst,* 311 U.S. 112, 117 (1940).

Respondent's determination that the various land sales transactions produced gross income to petitioner is presumed correct. *Welch v. Helvering,* 290 U.S. 111 (1933). Petitioner must prove the proceeds do not constitute gross income chargeable to him. Rule 142(a). In this regard, petitioner advances several theories explaining why these transactions do not create gross income to him. First, petitioner argues that because these transactions resulted in the acquisition by SCA of valuable landfill properties needed to expand its waste disposal business, SCA had a business purpose for engaging therein. Second, petitioner maintains that the purpose of these transactions was not to defraud SCA, but to generate sufficient funds for Carlton to repay SCA, thereby removing a questionable loan from SCA's books and promoting confidence in SCA's management and stock. Third, petitioner maintains that the form of the land sales transactions should be respected and the profits properly charged to the corporate entities (Lad, DIOC, J.C., and Essex) which transferred the respective parcels of land to SCA and its subsidiaries.

Respondent, on the other hand, argues that no legitimate business purpose existed for SCA to acquire properties at inflated values. Rather, the inflated landfill sales were designed to transfer SCA's funds to Carlton to protect petitioner's position as an officer of SCA and his equity investment in Carlton, benefits which are taxable to petitioner as gross income. Upon examining the record, we believe the profits derived from the land sales constituted gross income to petitioner.

We begin our discussion by disposing of petitioner's attempts to legitimatize these land sales transactions. In essence, petitioner would have us believe that because SCA acquired legitimate business assets and received payment of the Carlton loan, SCA was a beneficiary of the various land sales transactions directed by petitioner.

Petitioner fails to recognize that the landfill acquisition opportunities which he exploited were initially presented to SCA. In fact, petitioner's personal exploitation of these acquisition opportunities precipitated the subsequent civil action brought against him for breach of his fiduciary duties, the wasting of corporate assets, conversion of corporate funds, fraud, and negligence. Thus, while it was arguably in the business interest of SCA to have acquired the respective landfill sites, we see no underlying business purpose in nor benefit inuring from the paying of $2,728,000 to entities controlled by petitioner for properties that were initially offered for sale by third parties at approximately $455,000: SCA paid $1,265,000 for the Bentro landfill which was acquired by Lad for approximately $325,000, and $1,463,000 for the Amesbury parcels which were acquired by J.C. and Essex for $130,000. Further, the record shows that SCA was itself in a precarious financial position at the time petitioner and Steir directed SCA to purchase these properties. We are unwilling to accept that it is prudent on the part of a business in straitened circumstances to jeopardize its deteriorating financial position by intentionally overpaying $2,273,000 for business assets. Thus, we agree with respondent that SCA did not participate in the various transactions with a legitimate business purpose.

We likewise reject petitioner's suggestion that investor confidence in SCA's management and stock was bolstered by Carlton's returning a portion of the misappropriated SCA cash as payment of its loan. After reducing the fraudulent scheme to its substantive reality, we find Carlton's repayment of SCA's note with the misappropriated SCA cash to be little more than a gratis elimination of more than $1,200,000 in receivables from SCA's balance sheet. While removing the Carlton loan from the balance sheet did temporarily avoid further disclosure of a highly questionable management decision to the SEC and the investing

public, we do not believe that the $2,273,000 asset shrinkage attributed to petitioner's actions could have enhanced investors' confidence in SCA, its management, or its stock. We therefore dismiss as meritless petitioner's claim that he benefited SCA by defrauding it.

Petitioner next argues that he cannot be held to have realized gross income since he did not personally sell the properties in question and never directly received any of the proceeds from either transaction. With regard to the Bentro land purchase, while recognizing that the resale of the Utica landfill produced profits of over $1 million, petitioner alleges that these profits were earned by and taxable to Lad, a corporation wholly owned by Bentro, an unrelated party over whom petitioner had no control. Furthermore, petitioner asserts that the $965,000 advances made by Lad or Bentro to Carlton did not inure to his benefit, but represented bona fide loans, as evidenced by the creditor's claim subsequently submitted by Lad and Bentro in the Carlton Hotel of Lynn, Inc., bankruptcy proceeding. Respondent counters that the advances were not loans to Carlton but were fruits of a conspiracy whereby petitioner diverted SCA funds to his own use. After reviewing the record, we are not convinced that Lad and Bentro advanced the $965,000 to Carlton with a bona fide expectation of repayment. Rather, we believe that Lad's advances to Carlton represented a payment on behalf of petitioner of petitioner's share of the fraudulently obtained spoils.

As described above, the Bentro land sale involved the sale to B & B, a subsidiary of SCA, of a landfill and related equipment from Lad and its sole shareholder Bentro. The preface to the Bentro land sales transaction found Carlton in immediate need of sufficient cash to liquidate the debt owed to SCA. Unfortunately, the reduction in petitioner's net worth coupled with a rapid rise in interest rates prevented petitioner from securing additional bank funding to advance to Carlton. In an effort to reduce the SCA loan to under $1 million before the printing of SCA's proxy materials, petitioner had borrowed $300,000 from Adelman. Repayment of this loan was required within 120 days.

Against this backdrop, Bentro and petitioner joined together to engineer a scheme to unlawfully appropriate

approximately $1 million from SCA by causing a newly formed corporation, Lad, to acquire and then resell the Utica landfill to B & B, a SCA subsidiary. Nine hundred and sixty-five thousand dollars of the appropriated funds was subsequently forwarded to Carlton. Petitioner testified these advances were loans. However, his testimony failed to indicate the existence of loan documents, repayment terms, applicable interest rates, or security. In fact, it appears from the record that Lad's November 1974, advance of $175,000 was recorded on Carlton's books as an increase to the due to/due from account as opposed to a separate liability account. Moreover, petitioner failed to introduce the testimony of Bentro to corroborate his testimony regarding the intent of the advances. It is well established that the failure of a party to introduce evidence within his possession and which, if true, would be favorable to him, gives rise to the presumption that if produced it would be unfavorable. *Wichita Terminal Elevator Co. v. Commissioner,* 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947).

The lack of formal debt instruments, repayment terms, and an obligation to pay interest is significant evidence that an advance is not a bona fide debt. *Road Materials, Inc. v. Commissioner,* 407 F.2d 1121, 1123 (4th Cir. 1969), affg. on this issue T.C. Memo. 1967-187. Given the questionable financial condition of Carlton at the time, we cannot accept petitioner's assertion that a prudent unrelated lender (Lad) would make an unsecured interest-free loan of unlimited duration. Therefore, we conclude, notwithstanding the bankruptcy creditor claim filed by Lad and Bentro, that no debtor-creditor relationship arose between Carlton and Lad from the advances.

From a review of the entire record, we believe petitioner's critical role in directing and approving B & B's acquisition of the targeted landfill parcels provided him with sufficient leverage to direct Lad to advance over 90 percent of the profits to Carlton. We recognize petitioner testified that in structuring the purchase by B & B of the Utica landfill "we [told Mr. Bentro we] would be willing to accede to his price, if he would be willing to lend something just short of a million dollars to Carlton." For reasons previously dis-

cussed, we do not accept petitioner's implication that he was properly acting as a fiduciary of B & B in negotiating the above-market purchase price. Rather, we view the "loan condition" as an exercise of control by petitioner over his share of the appropriated funds. This advancement of funds to Carlton permitted Carlton to liquidate the Adelman debt on petitioner's behalf and to pay down the SCA debt. To the extent the proceeds were used to liquidate the Adelman debt, petitioner realized a direct accession to wealth; to the extent the proceeds were used to reduce the SCA debt, petitioner decreased the risk that he would be dismissed from the management of SCA, enjoyed the satisfaction that he was protecting the interests of the new SCA investors he had solicited as director of SCA's acquisitions, and increased the value of his equity interest in Carlton. Accordingly, we find, under principles established in *Commissioner v. Glenshaw Glass Co., supra,* and *Helvering v. Horst, supra,* that petitioner derived gross income from the Bentro land sale. Nonetheless, we fail to find sufficient facts to sustain respondent's determination that petitioner derived $759,925 of gross income during 1974 from the Bentro land sale. We therefore limit respondent's 1974 determination to $175,000; we sustain respondent's 1975 determination of an additional inclusion of $790,000 to petitioner's gross income.

Our analysis of the Amesbury property sales closely tracks that of the Bentro land sale. Like the latter, the Amesbury property sales involved the acquisition and immediate resale of landfill sites at inflated prices. Unlike the Bentro transaction, which used a corporation unrelated to petitioner to acquire and resell the targeted property, the Amesbury properties were acquired and resold by J.C. and Essex, corporations established at the direction of petitioner and controlled by him. After the resale of the land parcels at a profit of approximately $1,333,000, the stock of the now cash-rich corporations was acquired by Carlton for newly issued common stock.[6] Thereafter, $1,200,000 of the land sales profits was transferred to the new parent company Carlton to retire the SCA debt, the remaining $133,000 of profits being used to pay mortgage debts of Carlton.

---

[6]See note 4, *supra.*

Respondent determined, in the notice of deficiency, that the $1,333,000 profit derived from the purchase and resale of the Amesbury properties was chargeable to petitioner as gross income. Petitioner bears the burden of proving that the profit is properly chargeable to the corporate entities that transferred the land parcels to SCA. Rule 142(a).

Generally, a corporate entity will not be disregarded for tax purposes so long as it is formed for a substantial business purpose or actually engages in a business activity after its formation. *Moline Properties, Inc. v. Commissioner,* 319 U.S. 436 (1943). On the other hand, when a corporation is not formed for any significant, non-tax business purpose, and does not engage in any substantive business purpose, its existence will be disregarded for tax purposes, even though it may be validly incorporated under State law. *Noonan v. Commissioner,* 52 T.C. 907, 910 (1969), affd. per curiam 451 F.2d 992 (9th Cir. 1971). Petitioner has failed to establish that J.C., Essex, or DIOC were formed for any legitimate business purpose or ever engaged in any legitimate business activity. We conclude that petitioner formed these corporations solely for the purpose of furthering a scheme to fraudulently misappropriate funds from SCA and conceal his own participation in the scheme.

In reaching our conclusion, we note the absence of evidence that the corporations formed and controlled by petitioner did anything other than acquire and retransfer bare legal title to the targeted landfill parcels over a period of two days, and thereafter act as conduits for transferring the misappropriated funds to Carlton. The fact that the acquisition and resale of the landfill properties were completed within approximately 2 days of corporate formation strongly suggests that the "sale" was fully planned by petitioner and Steir individually and not by the transferring corporations petitioner would have us recognize. Moreover, petitioner has failed to establish that the corporations had boards of directors, officers which represented them in effecting the land sales transactions or ever filed corporate tax returns. Accordingly, we treat J.C., Essex, and DIOC as mere alter egos for petitioner and affirm respondent's

determination that the $1,333,000 proceeds constitute gross income derived by petitioner during 1975.[7]

## Issue 2. Additional Payments Received From SCA

During 1974 and 1975, petitioner received nonsalary payments from SCA in the amounts of $40,007 and $26,806, respectively. Petitioner claims that pursuant to section 1.274-5(e), Income Tax Regs., these payments represent valid reimbursements for travel, entertainment, telephone, and other expenses he incurred as president of SCA and need not be reported as additional income. Further, petitioner contends that SCA's employee reimbursement procedures complied with the requirements of the regulations under section 274.

Respondent claims that SCA's reimbursement procedures did not comply with the adequate record provisions of section 1.274-5, Income Tax Regs. Consequently, petitioner must substantiate the claimed expenses being reimbursed. And since petitioner did not substantiate the alleged reimbursed expenses during these proceedings, the claimed reimbursements must be treated as income.

After examining the record, we find that petitioner's expense reports did not satisfy the requisite elements of an adequate accounting to SCA under section 1.274-5(e)(4), Income Tax Regs. Accordingly, petitioner may not rely on the "wash" provision of section 1.274-5(e)(2)(i), Income Tax Regs., but must disclose the SCA reimbursements and substantiate the business expenditures pursuant to section 1.274-5(e)(3), Income Tax Regs. Because we have found that petitioner failed to adequately account, we need not inquire into the adequacy of SCA's accounting procedures. Such an inquiry is appropriate when determining whether an employee who makes an adequate accounting should nonetheless be required to separately substantiate his or her expense account information. See sec. 1.274-5(e)(5)(iii), Income Tax Regs.

_____

[7]As neither party requested that we specifically characterize the nature of the gross income petitioner derived from the land sale transactions, we express no opinion on whether the gross income was derived from embezzlement activities or from corporate distributions made pursuant to sec. 301. See *James v. United States*, 366 U.S. 213 (1961); *Truesdell v. Commissioner*, 89 T.C. 1280 (1987).

We begin our analysis with section 274(d). This subsection prohibits the deduction of otherwise allowable entertainment and travel expenses:

unless the taxpayer substantiates by adequate records or by sufficient evidence corroborating his own statement (A) the amount of such expense or other item, (B) the time and place of the travel, entertainment * * * , (C) the business purpose of the expense or other item, and (D) the business relationship to the taxpayer of persons entertained * * *. The Secretary or his delegate may by regulations provide that some or all of the requirements of the preceding sentence shall not apply * * *

Pursuant to the general rulemaking authority granted under section 7805, the Secretary issued section 1.274-5, Income Tax Regs. (T.D. 6630, 1963-1 C.B. 58, 61), to establish guidelines for substantiating travel and entertainment expenses. In particular, subsection 1.274-5(e), Income Tax Regs., provides guidelines for substantiating expenses incurred by employees. It provides that if an employee incurs a deductible business expense, meets specific substantiation and accounting requirements, and is reimbursed for the exact amount of the expenditure by his employer, the employee may treat the transactions as a wash and not report the reimbursement as income or take the otherwise allowable deduction. See secs. 1.274-5(e)(2)(i) and 1.162-17(b)(1), Income Tax Regs. Specifically, an employee makes an "adequate accounting" to his or her employer by submitting records he or she has maintained and upon which he or she has recorded (at or near the time of making the expenditure) the time, place, amount, and business purpose for the expenditure, together with adequate supporting documentation. Sec. 1.274-5(b) and (e)(4), Income Tax Regs. If the expenditure was for entertainment, the business relationship with the entertained person or persons must also be recorded. Sec. 1.274-5(b)(3)(v), Income Tax Regs. If the records maintained by the employee fail to document each of the elements described above, the employee has not adequately accounted to the employer. The corroborated oral or written statement of the employee will not cure this defect. Sec. 1.274-5(e)(4) and (c)(3), Income Tax Regs.

As discussed in our findings of fact, petitioner submitted information and receipts to his secretary, Elaine Watt.

However, Watt testified that at least some of the records petitioner submitted to her (i.e., the records pertaining to the petitioner's dinner engagements) failed to indicate the business purpose for the claimed expense or the business relationship to the persons for whom the claimed expense was incurred. Since business purpose and relationship are elements that must be substantiated by the records presented to the employer, petitioner's accounting was inadequate. Sec. 1.274-5(e)(4), Income Tax Regs. Petitioner must therefore submit both the reimbursements and the business expenditures on his tax return. In addition, he is required to maintain supporting evidence to substantiate each element of the business expenditure. Sec. 1.274-5(e)(3), Income Tax Regs.

We are persuaded from petitioner's testimony concerning his acquisition responsibilities and the more than 500,000 miles he logged as president of SCA that many, if not all, of the travel and entertainment expenses submitted for reimbursement were in fact legitimately incurred for the sole benefit of SCA. Unfortunately, the law requires that in addition to being a bona fide business expense, four or five descriptive elements must be substantiated by adequate records or corroborating evidence before the travel or entertainment expenditure may be deducted. Sec. 274(a) and (d). The evidence contained in the record fails to satisfy the substantiation elements of section 274. We may not remedy petitioner's inadequate compliance with section 274 by estimating the amount of travel and entertainment expenditures under principles articulated in *Cohan v. Commissioner*, 39 F.2d 540 (2d Cir. 1930). *Sanford v. Commissioner*, 50 T.C. 823, 827-828 (1968), affd. 412 F.2d 201 (2d Cir. 1969); sec. 1.274-5(a), Income Tax Regs. Furthermore, because we find no basis in the record for estimating the amount of telephone and other nontravel or nonentertainment expenses incurred by petitioner, we do not apply the principles of *Cohan* in this regard. For these reasons, we sustain respondent's determination that SCA's reimbursements are fully taxable to petitioner in the amounts of $40,007 and $26,806 for the years 1974 and 1975, respectively. Unfortunately, this rather exacting result, mandated by section 274(d), is of petitioner's own making.

*Issue 3: TWS Transaction—Contribution to Capital or Capital Gain.*

Petitioner, in his capacity as trustee for D & R Realty Trust, transferred a block of stock owned by D & R to Carlton for no consideration. He similarly transferred personal holdings of appreciated TWS stock to Carlton. Both transfers were treated by petitioner as contributions to the capital of Carlton. Immediately following the two transfers, Carlton resold both blocks of the transferred TWS stock to the TWS group.

Petitioner maintains that the transfers of the TWS shares to Carlton were required for Carlton to continue its business and were properly characterized as additional contributions to capital. He further asserts that since Carlton subsequently sold the stock and derived the sales proceeds, Carlton should be charged with the related capital gain.

Respondent argues that because petitioner enjoyed an increase in his Carlton capital account as a result of the gratis contribution of the TWS stock held by D & R, the value of the trust's stock constitutes gross income to him under section 61. Respondent also asserts that because the ultimate sale of the TWS stock was negotiated on behalf of petitioner in his individual capacity prior to the contribution to Carlton, the capital gains are properly allocable to petitioner. We agree with respondent.

As stated, petitioner treated the transfers of both his individual and the D & R blocks of TWS stock as contributions to the capital of Carlton. Respondent does not specifically challenge the accuracy of petitioner's treatment of the transfers as contributions to capital. By contrast, he implicitly accepts petitioner's chacterization of the transfers of the TWS stock by arguing on brief that because petitioner increased his Carlton stock basis to reflect the contribution of the D & R-owned stock, petitioner must include the value of the D & R stock in gross income. Respondent's argument that Carlton's sale of the TWS stock should be attributed to petitioner to reflect the substance of his negotiation with the TWS group is not necessarily inconsistent with petitioner's treatment. Thus, we do not view petitioner's treatment of the transfers as contributions to capital to be at issue and do not rule upon the propriety of such treatment.

Therefore, we limit our analysis to the consequences which flow from petitioner's contribution of both the D & R and his individually owned blocks of TWS stock to the capital of Carlton.

## Transfer of the D & R Block of TWS Stock

Respondent determined in his notice of deficiency that because the D & R block of TWS stock was transferred exclusively for the benefit of petitioner, the value of the stock constitutes gross income to petitioner. Petitioner bears the burden of proving why the transfer of stock worth $25,230 from D & R to Carlton is not gross income. Rule 142(a). Petitioner attempts to satisfy this burden by representing that the transfer amounts to "an additional price paid for the [Carlton] stock." While this representation may reflect the economic realities associated with the making of contributions to capital, it fails to explain why the benefit flowing from D & R to petitioner—the increased investment in Carlton—should be excluded from gross income. Respondent's determination is therefore sustained.

## Sale of the TWS Stock by Carlton

Respondent made the following determination with regard to the capital gain generated on the disposition sale of the TWS stock by Carlton in 1974:

It is determined that you realize a long-term capital gain of $199,874 from the sale of 1739 shares of common stock of Trans World Services, Inc. by the Carlton Hotel Corp. for your benefit which you failed to report as you did not file an income tax return. Accordingly, your taxable income is increased in the amount of $199,874 computed as follows:

| | | |
|---|---:|---:|
| Selling price | | $450,000 |
| Less: Adjusted basis 1,642½ shares[8] | $25,022 | |
| 97½ Shares (from D & R Realty Trust) | 25,230 | |
| | 50,252 | 50,252 |
| Realized gain | | 399,748 |
| Section 1202 deduction | | 199,874 |
| Income increased | | 199,874 |

[8]We previously determined that petitioner transferred 1,641½ shares of individually held TWS stock to Carlton. We attribute the 1-share difference in respondent's notice of deficiency to a typographical error. The parties have stipulated that $25,022 represents petitioner's basis in the transferred shares.

Respondent's determination that the capital gain was for the benefit of petitioner is presumed correct. *Welch v. Helvering, supra.* To rebut this presumption of correctness, petitioner must prove that Carlton effected a sale of the TWS stock for its own benefit. Rule 142(a). We note that consistent with including the $25,230 fair market value of D & R's 97½ shares of TWS stock in petitioner's gross income, respondent allowed petitioner a corresponding $25,230 basis in these shares. This $25,230 basis was inherited by Carlton when petitioner contributed the shares to Carlton's capital. Because Carlton's inherited basis in the 97½ shares reflects their full fair market value when Carlton subsequently transferred its TWS stock to the TWS group, the capital gain attributable to the transfer is entirely attributable to petitioner's block of 1,641½ shares.

Petitioner argues that he transferred the TWS stock to Carlton to provide funds "required by the corporation for conducting its business." Petitioner further asserts that because the stock was transferred to Carlton prior to the actual sale of the stock, and because the sales proceeds were retained by Carlton to discharge its indebtedness, he did not benefit from the sale. In other words, petitioner maintains that the form of the sale should be respected and control the tax consequences, in this case shielding him from tax liability.

While it is well established that taxpayers may structure a transaction to minimize tax consequences, e.g., *Helvering v. Gregory,* 69 F.2d 809, 810 (2d Cir. 1934), affd. 293 U.S. 465 (1935), it is equally clear that for the transaction structure to be respected, the structure must conform with substantive realities. See *Commissioner v. Court Holding Co.,* 324 U.S. 331 (1945). Indeed, the Supreme Court has stated:

The incidence of taxation depends upon the substance of a transaction. The tax consequences which arise from gains from a sale of property are not finally to be determined solely by the means employed to transfer legal title. Rather, the transaction must be viewed as a whole, and each step, from the commencement of negotiations to the consummation of the sale, is relevant. A sale by one person cannot be transformed for tax purposes into a sale by another by using the latter as a conduit through which to pass title. * * * [*Commissioner v. Court Holding Co., supra* at 334.]

With the above directive in mind, we review the record to determine whether Carlton was merely a conduit for the sale of the TWS stock by petitioner to the TWS group. *Stewart v. Commissioner,* 714 F.2d 977, 989 (9th Cir. 1983), affg. T.C. Memo. 1982-209.

For reasons which follow, we are persuaded that Carlton was merely a conduit to facilitate the completion of a stock transfer agreement fully negotiated on behalf of petitioner in his capacity as an investor. Approximately 1 year before transferring his stock to Carlton, petitioner began negotiations to sever his relationship with TWS. These negotiations began after petitioner concluded that "[TWS] had come to a point and they weren't growing any further." Petitioner testified that the negotiations were maintained on his "personal behalf." Petitioner does not allege nor does the record indicate that any officer or other representative of Carlton acted officially on behalf of the company as a party to the negotiations pertaining to the transfer of the TWS stock. On the contrary, Carlton's immediate resale of petitioner's 1,641½ shares of TWS stock when viewed together with the near simultaneous execution of a 15-year noncompetition and consulting contract between petitioner and TWS suggest that the ultimate terms regarding petitioner's separation from TWS were negotiated on behalf of petitioner and not Carlton. Carlton's failure to record the gain on the sale of the TWS stock on its 1974 Federal tax return further suggests that Carlton did not negotiate or participate in the substantive sale of the TWS stock to the TWS group. These factors and our review of the entire record persuade us that the terms for transferring the TWS stock were negotiated on behalf of petitioner in his individual capacity and that the sale was substantively made prior to the formal "contribution" of the shares to Carlton. We find Carlton acted as petitioner's conduit or agent in transferring the TWS stock pursuant to the substantive agreement. The incidence of tax arising from this sale is therefore properly attributable to petitioner. *Commissioner v. Court Holding Co., supra.*

Petitioner asserts that because the proceeds from the TWS stock provided funds that were used by Carlton to discharge its outstanding SCA obligation and otherwise con-

duct its business, he received no benefit from the transaction and should not recognize gross income. He fails, however, to cite any authority supporting the assertion that receipt of cash or a similar benefit is a prerequisite for the reallocation of tax consequences. While we recognize that the sales proceeds of recently contributed appreciated assets may often be distributed to the contributing shareholder masked as loan repayments or similar guises, e.g., *Stewart v. Commissioner, supra,* we are unprepared to find such a direct benefit to be necessary. Rather, we view Carlton's transfer of the TWS stock pursuant to the substantive obligations incurred by petitioner via the negotiations with the TWS group to constitute a benefit to petitioner.

Moreover, given petitioner's guarantee of certain indebtedness incurred by Carlton, it is not untenable to conclude that petitioner may have enjoyed the additional benefit of a reduced personal exposure as a result of Carlton's discharge of the SCA debt. In addition, petitioner has convincingly testified that the Carlton's debt to SCA posed a threat to his continued employment as president of SCA and to the welfare of the approximately 200 new investors he brought into SCA as director of acquisitions, a threat he intended to eliminate. We are persuaded from petitioner's own words that the proceeds from the sale of petitioner's TWS stock holdings were intended to reduce this threat, "So that negotiation [for the sale of the TWS stock] on my personal behalf  * * *  ended up solving other problems."

In light of petitioner's desire to use the proceeds of his personal negotiation to help solve the problem of Carlton's debt to SCA, we do not feel compelled to overrule respondent's determination that petitioner has benefited from the sale of the TWS stock solely because petitioner failed to receive cash from the proceeds of Carlton's sale. Therefore, we affirm respondent's determination that Carlton's sale of petitioner's 1,641½ shares of TWS stock to the TWS group was for the benefit (i.e., made on behalf) of petitioner.

### Issue 4: Petitioner's Cash Advances to Carlton.

During the years 1972 and 1973, petitioner, in his own name, obtained several bank loans and advanced in excess of $2 million therefrom to Carlton. These advances were

interest free, contained no specific repayment terms, and were not evidenced by a written agreement. The issue to be decided is whether petitioner is entitled to a bad debt deduction for the cash advances he made to Carlton.

Petitioner contends that his advances to Carlton represent bona fide loans under the test enunciated in *Estate of Mixon v. United States,* 464 F.2d 394 (5th Cir. 1972). He asserts that these loans became worthless in 1975, giving rise to a bad debt deduction under section 166(a)(1).

Respondent argues that petitioner's advances to Carlton constituted contributions to capital and not bona fide indebtedness. Respondent also argues that even if we were to regard petitioner's advances as bona fide business indebtedness, petitioner has failed to prove that they became worthless during 1974 or 1975, the years before this Court.

After reviewing the record and weighing the arguments of the parties, we find petitioner failed to prove that his advances to Carlton constituted debt. It is therefore unnecessary to consider the issue of worthlessness.[9]

The court in *Estate of Mixon v. United States,* 464 F.2d 394, 402 (5th Cir. 1972), articulated 13 factors which are useful in evaluating whether advances made to an entity represent debt or equity: the names given to the certificates evidencing the indebtedness; presence or absence of a fixed maturity date; source of payments; right to enforce payments; participation in management as a result of the advances; status of the advances in relation to regular corporate creditors; intent of the parties; "thinness" of capital structure in relation to debt; identity of interest between creditor and stockholder; source of the interest payments; ability of corporation to obtain credit from outside sources; use to which advances were put; failure of debtor to repay. See also *Dixie Dairies Corp. v. Commissioner,* 74 T.C. 476, 493 (1980).

As we stated in *Dixie Dairies Corp. v. Commissioner,* 74 T.C. at 493-494:

The identified factors are not equally significant (*Estate of Mixon v. United States, supra* at 402), nor is any single factor determinative. *John*

---

[9]Petitioner did not alternatively plead that the advances be considered worthless securities within the meaning of sec. 165(g). Therefore, we do not consider this issue.

*Kelley Co. v. Commissioner,* 326 U.S. 521, 530 (1946). Moreover, due to the myriad factual circumstances under which debt-equity questions can arise, all of the factors are not relevant to each case. * * * "The various factors * * * are only aids in answering the ultimate question whether the investment, analyzed in terms of its economic reality, constitutes risk capital entirely subject to the fortunes of the corporate venture or represents a strict debtor-creditor relationship." *Fin Hay Realty Co. v. United States,* [398 F.2d 694, 697 (3d Cir. 1968)]. As expressed by this Court, the ultimate question is "Was there a genuine intention to create a debt, with a reasonable expectation of repayment, and did that intention comport with the economic reality of creating a debtor-creditor relationship?" *Litton Business Systems, Inc. v. Commissioner,* 61 T.C. 367, 377 (1973).

Bearing in mind the relevant factors set forth in the above-cited cases, we have evaluated the arguments advanced by the parties in light of the facts contained in the record. We conclude that petitioner's advances were capital contributions rather than loans.

Petitioner first alleges that because Carlton had repaid advances in prior tax years and issued no stock certificates in return for the three advances at issue, the advances in question should be construed as demand loans. This characterization, he contends, is supported by Carlton's recording of the advances in the due to/due from current liability account and by the demand notes petitioner executed in favor of the bank.

We are not persuaded by petitioner's argument. While petitioner did testify that prior to 1971 he advanced money to Carlton and was repaid, he provided no specifics regarding the amounts advanced, circumstances precipitating the advances, duration of the advances, or the financial condition of Carlton at the time the funds were advanced (i.e., prior to the 1971 acquisitions of four hotels). Thus, while we have found that the pre-1971 advances were regularly repaid, we refuse to characterize the $2,450,000 advances as loans based upon an inference created by the repayment of pre-1971 advances which were not shown to be comparable in nature with those at issue.

Likewise, we reject petitioner's contention that the notes he issued to the lender banks to procure the advanced funds evidenced a debtor-creditor relationship with Carlton. On the contrary, we find petitioner's admission that the loans were personal and not made to him as an agent of Carlton

dispositive of this contention. We will not impute a debt instrument, payment-on-demand condition, or interest rate into petitioner's transaction with Carlton. Petitioner is a highly sophisticated businessman who regularly executed notes to procure funds for himself and SCA. We are confident that he was fully cognizant of the significance of a formally executed note and underlying security to a lender.

Given petitioner's business experience, his controlling equity interest in Carlton, and Carlton's apparent inability to expeditiously borrow funds from independent creditors, we view petitioner's failure to follow form as evidence that the advances were not intended to be debt. *Kaplan v. Commissioner*, 59 T.C. 178, 186 (1972). The fact that Carlton recorded the advances as liabilities does not change our view. See *Road Materials, Inc. v. Commissioner*, 407 F.2d 1121, 1124 (4th Cir. 1969), affg. on this issue T.C. Memo. 1967-187.

Petitioner next asserts that because the advance was intended to be repaid from either the sale or refinancing of Carlton's real estate, as opposed to corporate earnings, the transaction reflects a loan to Carlton. *Estate of Mixon v. United States, supra.* at 405. We are again uncompelled by petitioner's argument. Unlike the taxpayer in *Estate of Mixon*, which could look only to the cash generated by the collection of a bond claim and the collection of charged-off loans for repayment of his advances, petitioner has failed to prove that earnings from operations could not be used to repay the advances. Given the unspecified length of the advance and absence of any subordinating or restrictive agreement, we refuse to conclude that future repayment could "without question not [be attributable to] earnings or profits." *Estate of Mixon v. United States, supra* at 405.

Petitioner next asserts that Carlton was not "thinly capitalized" or unable to obtain independent financing during 1971, 1972, and early 1973. In support of adequate capitalization, he relies on the testimony of George Smith (Smith), the certified public accountant who prepared Carlton's 1973 and 1974 corporate tax returns. Smith testified that Carlton's debt-to-equity ratio increased from three to one "in the earlier year" (presumably 1973) to six

to one in 1974. Despite acknowledging continuous cash-flow problems, Smith testified that both ratios were within the realm of adequate capitalization, although he articulated no reasonable basis for this belief. In support of Carlton's ability to borrow from third party lenders, petitioner relies on testimony that Carlton engaged in negotiations to refinance its realty.

We find Smith's testimony unpersuasive on the issue of adequate capitalization. First, we are not convinced that Smith was associated with Carlton at the time it received petitioner's advances. Specifically, Smith testified that his association began "sometime in 1972 or 1973." Since Smith was not involved in the preparation of Carlton's 1972 calendar yearend tax returns, we believe it quite possible that the relationship did not begin until after the final $1 million advance was made in February 1973. Thus, we limit the scope of Smith's testimony to the financial condition of Carlton at the time of the 1973 advance.

Moreover, we are not convinced that Smith's opinion was based on accurate information. Smith testified that his debt-to-equity ratios were derived by adopting Carlton's representations concerning the underlying values of its properties. While it is established that debt-to-equity ratios should reflect real values rather than artificial par and book values (see *Kraft Foods Co. v. Commissioner*, 232 F.2d 118, 127 (2d Cir. 1956), revg. 21 T.C. 513 (1954); *Cleveland Adolph Mayer Realty Corp. v. Commissioner*, 6 T.C. 730, 741 (1946), revd. 160 F.2d 1012 (6th Cir. 1947)), the record lacks any specific reference (written or otherwise) to the underlying value of Carlton's assets during 1973.

The record also fails to contain any information regarding capitalization averages in the hotel industry. By contrast, the balance sheet attached to Carlton's 1973 Form 1120, U.S. Corporation Income Tax Return, clearly reflects book-valued deficits in shareholders' equity of $1,687,747 and $2,224,170 for the taxable years ended December 31, 1972 and 1973, respectively. The balance sheet also reflects the removal of $2,181,785 of buildings and other fixed depreciable assets and the reduction of $1,960,389 of related long-term debt during 1973. Based upon petitioner's failure to produce evidence of appreciation in Carlton's realty, the

substantial deficits in the stockholders' book value equity accounts and the 33-percent reduction in fixed assets during 1973, we are unable to verify that any equity existed in Carlton during 1972 or 1973.

Furthermore, were we to conclude that equity was present in Carlton, petitioner's admission that during 1971 Carlton "didn't have the operating capital to reach its potential," when coupled with Carlton's expensive capital improvements of 1973, would cause us to question the adequacy of such equity during 1972 and 1973. Accordingly, we conclude that petitioner has failed to establish the presence of significant capitalization at the time he advanced his $2,450,000 loan proceeds to Carlton. Likewise, we infer from Carlton's unsuccessful refinancing attempts that the company's ability to acquire financing from arm's-length lenders was limited during 1972 and 1973.

Petitioner also submits that because his participation in management did not change, because the advances were not subordinated to other Carlton creditors, and because the minority shareholders made no proportionate advances, the advances should be characterized as loans. We recognize that viewed in isolation these factors weigh in favor of characterizing an advance as debt. However, as discussed above, these factors are merely tools to be used in evaluating whether the transaction as a whole was effected with a genuine intention to create a debt, with a reasonable expectation of repayment, and within the economic realities of a debtor-creditor relationship. See *Litton Business Systems, Inc. v. Commissioner*, 61 T.C. 367 (1973).

Based upon the entire record, we find it extremely improbable that a prudent creditor would lend money interest free, unsecured, and for an unspecified period of time to an entity in Carlton's questionable financial condition. We therefore refuse to treat petitioner as a creditor who expected to be repaid his advanced funds. Economic realities require petitioner's advances be characterized as capital contributions for Federal tax purposes. See *Segel v. Commissioner*, 89 T.C. 816, 828-829 (1987). Accordingly, petitioner is not entitled to a bad debt deduction under section 166(a) for any portion of the $2,450,000 bank loan proceeds he advanced to Carlton.

## Issue 5: Deductibility of Interest Charges

During 1974 and 1975, petitioner made interest payments in the amounts of $249,327 and $126,074, respectively, on the $2,450,000 personal bank loans he incurred to raise a portion of the cash he advanced to Carlton during 1972 and 1973. In his supplemental trial memorandum filed with this Court on the opening day of trial, respondent first raised the issue of whether the interest deductions incurred by petitioner were subject to limitation under section 163(d).[10] Accordingly, respondent bears the burden of proof on this issue. Rule 142(a). To satisfy his burden of proof, respondent must establish that petitioner incurred the $2,450,000 indebtedness to "purchase or carry property held for investment." Sec. 163(d)(3)(D).

Respondent asserts that petitioner's advances to Carlton were in substance contributions to capital which served to protect and increase his equity interest. Because the proceeds from the bank loans were used to increase petitioner's investment in Carlton, respondent further contends that the interest paid thereon during the years at issue is subject to the deduction limitations of section 163(d). We agree with respondent.

Consistent with our prior holding that the advances of bank loan proceeds constituted contributions to Carlton's equity, we construe the respective bank loans to have been incurred to purchase additional equity investments. We now determine whether these additional equity investments constitute properties held for investment.

---

[10]Sec. 163(d) provided in pertinent part:

(1) IN GENERAL.—In the case of a taxpayer other than a corporation, the amount of investment interest (as defined in paragraph (3)(D)) otherwise allowable as a deduction under this chapter shall be limited, in the following order, to—

(A) $25,000 * * *, plus

(B) the amount of the net investment income * * * plus the amount (if any) by which the deductions allowable under this section (determined without regard to this subsection) and sections 162, 164(a)(1) or (2), or 212 attributable to property of the taxpayer subject to a net lease exceeds the rental income produced by such property for the taxable year.

\* \* \* \* \* \* \*

(3) DEFINITIONS.—For purposes of this subsection—

\* \* \* \* \* \* \*

(D) INVESTMENT INTEREST.—The term "investment interest" means interest paid or accrued on indebtedness incurred or continued to purchase or carry property held for investment.

Neither the code nor the regulations define "property held for investment." The legislative history, however, limits the universe of potential "investment property" within the section 163(d) context to property other than personal use property or trade or business property. See *Polakis v. Commissioner*, 91 T.C. 660 (1988), discussing H. Rept. 91-413 (Part 1) (1969), 1969-3 C.B. 200, 246. Characterizing property as "investment property" requires us to examine the facts to ascertain the presence or lack of "substantial investment intent." *Miller v. Commissioner*, 70 T.C. 448, 455-456 (1978).

In *W.W. Windle Co. v. Commissioner*, 65 T.C. 694, 714 n. 15 (1976), this Court observed that "stock is normally a capital asset" owned for investment purposes and only where the "original purpose of [the] acquisition and the reason for continued retention are both devoid of substantial investment intent should the stock be treated otherwise." While we recognize that the discussion of substantial investment intent in *W.W. Windle Co.* arose in the context of whether the presumed judicial exception of *Corn Products Refining Co. v. Commissioner*, 350 U.S. 46 (1955), to section 1221 would apply to stock holdings, we believe our observation accurately describes the characteristics associated with stock ownership in the section 163(d) context.[11] Nonetheless, we recognize that, in some circumstances, stock may be acquired for business purposes without substantial investment purposes. See *Arkansas Best Corp. v. Commissioner*, 83 T.C. 640, 653-654 (1984), revd. on other grounds 800 F.2d 215 (8th Cir. 1986), affd. 485 U.S. __ (1988).

Petitioner testified that he considered his ownership of Carlton primarily as an investment in the company's real property holdings. There is no evidence that petitioner considered his Carlton stock holdings to be anything other than an investment. Thus, we conclude that prior to advancing the bank loan proceeds, petitioner held his Carlton stock with substantial investment intent.

In 1971, the year preceding the first $1,450,000 of advances, petitioner believed Carlton's realty holdings were

[11]See *Webbe v. Commissioner*, T.C. Memo. 1987-426, n. 28 (54 T.C.M. 281, 192 n. 28, 56 P-H Memo T.C. par. 87,426, at 87-2219 n. 28);*Yamamoto v. Commissioner*, T.C. Memo. 1986-316.

worth in excess of $3 million over the associated liabilities. Based upon the record as a whole, we find petitioner continued to believe (although we previously found that the evidence failed to affirmatively establish) that Carlton possessed an equity interest in its realty during 1972 and 1973. When this perceived equity was threatened by Carlton's inability to raise sufficient funds to retire SCA's loans, petitioner's investment in Carlton stock was similarly threatened. In the interest of preserving the value of his Carlton stock, petitioner personally borrowed additional funds which he contributed to Carlton. Accordingly, we find the additional equity petitioner purchased with the proceeds of the $2,450,000 bank loans was acquired with a substantial investment motive.

Petitioner chose not to discuss the applicability of section 163(d) in his brief. He did, however, testify he believed disclosure of the unpaid Carlton loans threatened to prevent him from initially assuming and thereafter continuing to perform his duties as SCA president. Based upon this testimony, it may be argued that investment was not petitioner's exclusive motive in making additional contributions to Carlton's capital. Because "every person who works for compensation is engaged in the business of earning his pay" (*Noland v. Commissioner*, 269 F.2d 108, 111 (4th Cir. 1959), affg. a Memorandum Opinion of this Court), one may argue that petitioner incurred the bank loans and contributed the proceeds to Carlton to preserve his employment in SCA, a business rather than an investment purpose. Assuming arguendo that petitioner's contributions to Carlton served the business purpose of maintaining his continued employment at SCA, we nonetheless conclude, after comparing petitioner's modest salary of approximately $50,000 to the personal liability of $2,450,000 which he assumed, that the contributions were motivated substantially by investment purposes and only incidentally by business purposes. Therefore, the contributions to capital constitute investment properties and the interest payments on the associated bank loans are subject to the section 163(d) limitation.

*Issue 6: Fraud—Additions to Tax—Section 6653(b)*

Respondent imposed an addition to petitioner's tax for fraud under section 6653(b) for each year at issue.[12] To establish the existence of fraud, respondent must prove by clear and convincing evidence that (1) petitioner underpaid his income tax and (2) some part of the underpayment was due to fraud. Sec. 7454(a); Rule 142(b); *Stone v. Commissioner,* 56 T.C. 213, 220 (1971). Our prior findings in this case clearly and convincingly establish the existence of an underpayment in each of the years at issue. As relevant to this case, section 6653(c)(1) defines an "underpayment" for purposes of section 6653 as a "deficiency," defined under section 6211. The remaining question for decision is whether all or part of the underpayment in each year at issue was due to fraud.

Fraud is established by proving that the taxpayer intended to evade tax believed to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of such tax. *Rowlee v. Commissioner,* 80 T.C. 1111, 1123 (1983); *Gajewski v. Commissioner,* 67 T.C. 181 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). Respondent need not establish that tax evasion was a primary motive of petitioner, but may satisfy his burden by showing that a "tax-evasion motive play[ed] *any part*" in petitioner's conduct, including conduct designed to conceal another crime. *Worcester v. Commissioner,* 370 F.2d 713, 717 (1st Cir. 1966), affg. in part and vacating in part (on another issue) T.C. Memo. 1967-107, citing *Spies v. United States,* 317 U.S. 492, 499 (1943) (emphasis in original).

The existence of fraud is a question of fact that we must resolve upon considering the entire record. *Teitelbaum v. Commissioner,* 294 F.2d 541, 547 (7th Cir. 1961); *Gajewski v. Commissioner,* 67 T.C. at 199; *Estate of Pittard v. Commissioner,* 69 T.C. 391 (1977). Fraud is never imputed or presumed, but must be established by independent

---

[12]Sec. 6653(b), as in effect during the years at issue, provides in pertinent part as follows:

SEC. 6653(b). FRAUD.—If any part of any underpayment * * * of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. In the case of income taxes and gift taxes, this amount shall be in lieu of any [addition to tax for negligence]. * * *

evidence. *Beaver v. Commissioner,* 55 T.C. 85, 92 (1970); *Otsuki v. Commissioner,* 53 T.C. 96 (1969). However, fraud may be proven by circumstantial evidence because direct proof of the taxpayer's intent is rarely available. *Spies v. United States, supra; Rowlee v. Commissioner, supra.* The taxpayer's entire course of conduct may be examined to establish the requisite fraudulent intent. *Stone v. Commissioner,* 56 T.C. at 223-224; *Otsuki v. Commissioner,* 53 T.C. at 105-106. Having considered all of the evidence before us, we conclude respondent has clearly and convincingly established fraud under section 6653(b) in each year at issue.

In *Bradford v. Commissioner,* 796 F.2d 303, 307-308 (9th Cir. 1986), affg. T.C. Memo. 1984-601, the Ninth Circuit Court of Appeals articulated a nonexclusive list of factors which demonstrate fraudulent intent. These "badges of fraud" include: (1) Understating income, (2) maintaining inadequate records, (3) failing to file tax returns, (4) giving implausible or inconsistent explanations of behavior, (5) concealing assets, (6) failing to cooperate with tax authorities, (7) engaging in illegal activities, (8) attempting to conceal illegal activities, (9) dealing in cash, and (10) failing to make estimated tax payments. Other badges include the backdating of checks or the filing of false documents such as the Form W-4E. *Stephenson v. Commissioner,* 79 T.C. 995, 1007 (1982), affd. 748 F.2d 331 (6th Cir. 1984).

Respondent contends that the combination of the following acts specifically demonstrates petitioner's intent to evade paying tax on all or a part of the underpayment we have determined:

(1) Petitioner's intentional failure to file tax returns for 1974 and 1975.

(2) Petitioner's failure to report substantial amounts of salary, consulting income, and funds he fraudulently diverted from SCA during 1974 and 1975.

(3) Petitioner's transfer of his TWS stock to Carlton before its sale to the TWS group to evade payment on the resulting capital gain.

(4) Petitioner's filing of Forms W-4E, Exemption From Withholding (of Federal Income Tax), in connection with his SCA employment during 1974 and 1975.

It is well established that while a taxpayer's failure to file a tax return is an indication of fraud, it does not, standing alone, establish fraud. *Merritt v. Commissioner,* 301 F.2d

484, 487 (5th Cir. 1962); *Kotmair v. Commissioner*, 86 T.C. 1253, 1260-1261 (1986), and cases cited therein. When, however, the failure to file is coupled with other badges or circumstances that establish an intent to conceal or mislead, an inference of fraud is justified. *Kotmair v. Commissioner, supra.* See also *Holland v. United States*, 348 U.S. 121, 137 (1954). We therefore examine the record to identify the presence or absence of other fraudulent indicia.

Petitioner's filing of Forms W-4E to avoid the withholding of Federal income taxes from his SCA salary during 1974 and 1975 is a highly probative badge if respondent proves such filing was fraudulent. *Stephenson v. Commissioner, supra.* The parties stipulated that petitioner filed Forms W-4E with SCA for 1974 and 1975. Respondent, however, failed to introduce the alleged falsely filed forms into evidence. We do, however, take judicial notice of the 1974 and 1975 Forms W-4E and related instructions (as published by the U.S. Government Printing Office) for purposes of evaluating whether petitioner's filing was false.[13]

Regarding entitlement to claim exemption from withholding of Federal income tax, the 1974 Form W-4E instructions provided:

You may be entitled to claim exemption from withholding of Federal income tax if you incurred no liability for income tax for 1973 and you anticipate that you will incur no liability for income tax for 1974. For this purpose, you incur tax liability if your joint or separate return shows tax before the allowance of any credit for income tax withheld. * * *

The face of the Form W-4E, itself, required the employee to certify under penalties of perjury that he or she incurred no liability for Federal income tax for 1973 and anticipated no liability during 1974. Thus, proper filing of a Form W-4E required a sworn statement that no tax liability was shown on the prior year's tax return.

The parties stipulated that petitioner filed a Federal income tax return for the year 1973. The stipulation did not, however, disclose whether or not petitioner's 1973 income tax return showed a tax liability before the allowance of credits. Our review of the record fails to reveal any

---

[13]We have previously taken judicial notice of Federal income tax forms and instructions in *Stanoch v. Commissioner*, T.C. Memo. 1959-131.

evidence that petitioner's 1973 tax return showed a tax liability prior to applying withholdings. Respondent bears the burden of proving this fact.[14] Thus, we do not find the 1974 W-4E to be false. On the other hand, the fact that petitioner earned $57,250 in salary during 1974 imposed a requirement that he file a Federal tax return under section 6012(a)(1)(A)(i) (requiring single persons with gross income of $2,050 or more to file). Petitioner's admission that he failed to file a 1974 tax return unequivocally discredits his sworn 1975 W-4E certification that the 1974 return showed no tax liability before the allowance of any credit for income tax withheld. Thus, petitioner's 1975 W-4E was fraudulent.

Respondent's failure to prove the 1974 Form W-4E to be fraudulently filed is not dispositive of the issue of fraud for that year. On the contrary, we infer from petitioner's "day of the sale" transfer of his appreciated TWS stock to Carlton and Carlton's failure to include the subsequent sales transaction in its taxable income that petitioner intended to evade the payment of tax on the recognized capital gain. Similarly, while we recognize that petitioner's use of straws and nominees to mask his fraudulent dealings with SCA was intended to conceal his misdeeds from the nonconspiring members of SCA's management and the SEC, we infer that he also intended to conceal his actions from respondent. Indeed, as we stated in *McGee v. Commissioner*, 61 T.C. 249, 260 (1973), affd. 519 F.2d 1121 (5th Cir. 1975), "it is a fair inference that a man who will misappropriate another's funds to his own use through misrepresentation and concealment will not hesitate to misrepresent and conceal his receipt of those same funds from the Government with intent to evade tax." See also *Rogers v. Commissioner*, 111 F.2d 987 (6th Cir. 1940). The fact that no record exists of any tax return being filed by the straws or nominees strengthens our inference. Accordingly, we conclude that

---

[14]We note that respondent determined a sec. 6654 addition to tax for petitioner's failure to timely pay his 1974 estimated tax (which we sustain *infra*). Such a determination, in some circumstances, might be improper under sec. 6654(d)(1) (providing no addition if the estimated payments equaled or exceeded the tax shown on the return of preceding taxable year) were there no tax liability shown on petitioner's 1973 tax return. We do not, however, permit respondent to satisfy his burden of proof with a determination that we affirm only because the taxpayer failed to meet a burden of overcoming it. To hold otherwise would "allow the Commissioner to raise himself by his own bootstraps." *George v. Commissioner*, 338 F.2d 221, 223 (1st Cir. 1964), revg. T.C. Memo. 1963-326.

respondent has presented clear and convincing evidence that petitioner intended to evade the payment of all or a portion of the underpayment we have determined. Our finding of fraud under section 6653(b) makes inapplicable any further additions to tax for negligence or failure to timely file under sections 6653(a) and 6651(a)(1), respectively.

### Issue 7: Section 6654 Addition to Tax

Respondent also determined additions to tax for the taxable years 1974 and 1975 under section 6654 for underpayment of estimated Federal income tax. This addition to tax is mandatory absent a showing by petitioner that one of the several statutorily provided exceptions applies. *Grosshandler v. Commissioner*, 75 T.C. 1, 20-21 (1980). Petitioner made no such showing. Respondent's determination is therefore sustained.

To reflect the foregoing,

*Decision will be entered under Rule 155.*